Graham v. McReynolds.

GRAHAM v. McREYNOLDS.

(*Knoxville.*   November 12, 1891.)

1. SEDUCTION.  *Correctly defined in Court's charge.*

Seduction is correctly defined in Court's charge as follows: "The fact that a man and woman previously virtuous, engage in acts of illicit sexual intercourse does not, of itself, constitute seduction, but there must be some previous inducement, promise or artifice, deception or overpersuasion by the man, followed by sexual intercourse as the result of such promise, inducement, or overpersuasion, to constitute the offense of seduction.   The willingness of the woman to yield her virtue, and the willingness of the man to despoil her of it, does not, of itself, constitute the offense; but if the woman is made willing to part with her virtue by the false or fraudulent acts, promises, inducements, or ·persuasion of the man, then he is guilty of seduction." (*Post, pp. 677, 678.*)

Cases cited and approved: Reed *v.* Williams, 5 Sneed, 581; Franklin *v.* McCorkle, 16 Lea, 628.

2. WITNESS.  *May explain previous contradictory statements.*

A witness admitting, on cross-examination, that he had made previous statements, or pursued a course of conduct, inconsistent with his evidence, is entitled to give, in connection with his answer to the cross-question, an explanation of the attending circumstances explanatory of such statements and conduct.   (*Post, pp. 678–682.*)

3. SAME.  *Same.*

But the explanation in such case must be confined to such matters as concern the witness himself, and may not be extended to such matters as affect third persons.   (*Post, pp. 682, 683.*)

4. SAME.  *Same.*

Witness impeached by contradictory statement contained in his deposition, previously taken in the case, may be corroborated by proof that the statement contained in the deposition was put there by mistake

43—6 P

of the commissioner, and was not, in fact, that made by the witness. (*Post, pp. 698–702.*)

Cases cited: Bounds *v.* Schwab, 5 Sneed, 594; Nelson *v.* State, 2 Swan, 259.

5. SAME. *Corroboration of by previous consistent statements.*

Witness' previous consistent statements, made before the contradictory statements, are admissible to sustain his credit in all cases where he is impeached by his previous inconsistent statements. (*Post, pp. 693–698.*)

Cases cited: Story *v.* Sanders, 8 Hum., 666; Dossett *v.* Miller, 3 Sneed, 76; Queener *v.* Morrow, 1 Cold., 134; Bank *v.* Robinson, 1 Bax., 484; Hayes *v.* Cheatham, 6 Lea, 10; Glass *v.* Bennett, 89 Tenn., 481.

6. EVIDENCE. *Admissibility of letters.*

One side of a correspondence having been put in evidence, the other side becomes competent as explanatory of the first. (*Post, pp. 702, 703.*)

7. PRACTICE. *General exclusion of incompetent evidence sufficient, when.*

If the motion to exclude incompetent evidence is general, not specific, an order of the Court in like general terms excluding the evidence is sufficient. (*Post, pp. 683, 684.*)

8. SAME. *Erroneous indorsement of witness' credibility by the Court.*

It is error for the Court to give his indorsement to the credibility of a witness in the presence of the jury—*e. g.*, to say of a witness undergoing cross-examination: "I take it that Mrs. McR. [the witness] is doing the best she can in the matter." (*Post, pp. 684–686.*)

Case cited: McDonald *v.* State, 89 Tenn., 164.

9. SAME. *Not error for Court to speak of immaterial evidence, when.*

It is not error for the Court to suggest, in the course of a cross-examination, that "It strikes me this is immaterial," when the matter being inquired about was palpably so. (*Post, pp. 689, 690.*)

10. SAME. *Court's discretion as to re-examination of witness.*

The Court may, in the exercise of his discretion, permit original matter to be brought out on re-examination of a witness over objection. (*Post, p. 688.*)

Case cited and approved: Railroad *v.* Mitchell, 11 Heis., 408.

Graham *v.* McReynolds.

11. SAME. *Exception to evidence upon untenable grounds.*

Although evidence is incompetent, the trial Court cannot be put in error by his overruling an untenable exception to it; and the party excepting thereto cannot change his grounds of exception in the Appellate Court. (*Post, pp. 688, 689.*)

12. SAME. *General exceptions to evidence ineffectual.*

The admission of immaterial evidence over general exceptions does not constitute reversible error when Court cannot see that any injury resulted. (*Post, p. 689.*)

13. SAME. *As to Court asking questions.*

The Court may ask questions in the course of the examination of witnesses if he takes care not to elicit incompetent evidence, and not to indicate his opinion of the weight or importance of the evidence he seeks to elicit. (*Post, pp. 690–692.*)

Cases cited and approved: McDonald *v.* State, 89 Tenn., 164; Hill *v.* State, 5 Lea, 731; Butler *v.* Boyles, 10 Hum., 155; Sharp *v.* Treece, 1 Heis., 448.

14. MAINTENANCE. *Father's maintenance of minor child's suit.*

The father may lawfully instigate and maintain a suit by his unmarried infant daughter to recover damages for her seduction. (*Post, p. 703.*)

Code construed: § 3502 (M. & V.) ; § 2802 (T. & S.).

---

## FROM MARION.

---

Appeal in error from Circuit Court of Marion County. JOHN A. MOON, J.

W. L. EAKIN, C. MARCHBANKS, DONALDSON & WADDELL, A. S. MARKS, and PICKLE & TURNER for Graham.

W. D. Spears, A. L. Spears, W. J. Clift, Lewis Shepherd, Foster V. Brown, Ingersoll & Peyton, and Taylor & Thompson for McReynolds.

T. S. Webb, Sp. J. This suit was brought by the defendant in error against the plaintiff in error, in the Circuit Court of Marion County, to recover damages for an alleged seduction and breach of marriage promise. The case was tried in the Court below, in July, 1891, upon proper pleadings, when there were verdict and judgment for the plaintiff, and her damages assessed at $15,000. The defendant's motion for a new trial was overruled, and he has appealed in error to this Court.

The case was before us at the September term, 1889, upon the appeal of defendant in error from a verdict for a larger sum than $15,000, and was reversed for errors of law, and remanded for a new trial; so that we now have it before us for the second time.

Error is assigned to the charge of the trial Judge in one particular only. That portion of the charge complained of is as follows:

"The fact that a man and woman previously virtuous, engage in acts of illicit sexual intercourse does not, of itself, constitute seduction, but there must be some previous inducement, 'promise, or artifice, deception or overpersuasion by the · man, followed by sexual intercourse as the result of such promise, inducement, or overpersuasion to constitute the offense of seduction. The willing-

ness of the woman to yield her virtue, and the willingness of the man to despoil her of it, does not, of itself, constitute the offense; but if the woman is made willing. to part with her virtue by the false or fraudulent acts, promises, inducements, or persuasion of the man, then he is guilty of seduction."

The error assigned is, that this portion of the charge means that mere *persuasion* can constitute seduction, if followed by illicit sexual intercourse as a result of such persuasion. The charge is not susceptible of this construction. His Honor twice uses the term "*over*persuasion" as an equivalent of "inducement," "promise," "artifice," or "deception;" and then, in the last clause above quoted, he uses the term "false or fraudulent persuasion" as an equivalent of "false or fraudulent acts, promises, or inducements." He nowhere uses the term "persuasion" as an unqualified term, but says "overpersuasion" or "false or fraudulent persuasion," and we hold that the terms used are at least equivalent to the terms "inducement," "promise," "artifice," or "deception." But, even if his Honor had used the word "persuasion" without qualifying it, he would not have been in error.

In the case of *Reed* v. *Williams*, 5 Sneed, 581, the charge of the Court below was: ·

"That it was not necessary for the plaintiff to show that the defendant had used flattery or made false promises to his daughter; that it would be sufficient if the seduction resulted from the *solici-*

*tation* and *importunity* of the defendant to the daughter to indulge in criminal intercourse, in consequence of which she consented." Judge Mc-Kinney, delivering the opinion of the Court, held: "There is no error in this instruction. * * * It cannot be at all important by what means, or by which of the multifarious devices of the se-ducer, he may have prevailed in the accomplishment of his purpose. It is enough that, by any means or arts, he tempted or *persuaded* his victim to the surrender of her chastity."

This holding is quoted with approval by Judge Freeman in *Franklin* v. *McCorkle*, 16 Lea, 628; and, in the same case, Judge Freeman defines the word seduction to mean "the offense of a man who *induces* a woman to surrender her chastity."

The next error assigned is to the action of the Court in relation to the testimony of Martha J. McReynolds, a witness for plaintiff, below. This witness is a sister of the defendant, John Graham, and is the step-mother of the plaintiff, being the second wife of James W. McReynolds, the father of plaintiff. Plaintiff gave birth to an illegitimate child about November 26, 1886, and claims that the defendant is the child's father. On her direct examination, Mrs. McReynold's testified that, in the spring of 1886, she became suspicious that something was wrong with the plaintiff, and accused her brother John of being the author of it; that John admitted his guilt; agreed to have plaintiff examined by a physician, and also agreed to marry

her; and urged the witness not to disclose plaintiff's condition to her (witness') husband, or to his (defendant's) parents; that defendant afterward took plaintiff down to his father's house and had her examined by Dr. Cotnam, and then reported to the witness that the doctor said it was a false alarm, as plaintiff only had a bad cold.

The tendency of her direct examination was to fix the guilt on her brother, by his own admissions. She also testified to the antecedent purity of her step-daughter, the plaintiff.

On cross-examination, the credibility of this witness was vigorously assailed by the defendant's counsel, (1) with the view of showing by her that she had previously made statements contradictory of the statements made in her direct examination, or, if she denied making such previous statements, then to contradict her by the testimony of other witnesses, showing that she had made such previous statements; and (2) with the view of showing by her that the statements in her direct examination were made under the threats and duress of her husband (plaintiff's father), J. W. McReynolds, or laying grounds for impeaching her by other witnesses, in case she denied such threats and duress.

In order to correctly understand the question to be considered, it should be stated that about the time of the death of Mrs. Graham—the mother of the witness and of defendant—which occurred in the latter part of May, 1888, the witness left

her husband and went to her mother's home, about two and one-half miles distant, which was also the home of the defendant, John Graham. Early in June, 1888, she filed a divorce bill against her husband, J. W. McReynolds, in which she made many charges of threats and violence indulged in by him against her, and also charges which tended to show that her husband was much dissatisfied with the will of her father, Hope Graham, Sr., and was animated by great hatred of the Graham family.

Mrs. McReynolds dismissed this bill, and returned to her husband about July 11, 1888. During the short life of this divorce suit, she remained at her mother's home with the defendant; and while there the alleged statements were made which are claimed to be contradictory of her direct examination.

Defendant's counsel were endeavoring to impeach the witness on cross-examination, by drawing from her admissions or denials of said statements and the allegations of said divorce bill. With this view, a number of questions were propounded to the witness, reciting statements alleged to have been made by her contradictory of her statements made on her direct examination, and fixing time and place, and asking the witness if she had made such statements. The witness admitted that she had made the impeaching statements, but in every case undertook to explain that the statements were not true, and were made through the persuasion

and influence of her brother John and his friends. Finally, the following questions were asked and answers given:

"*Ques.*—Didn't you say there, and also charge in your bill, that Mr. McReynolds drew his pistol and presented it at you, and said he intended to kill the whole damn set of Grahams?

"*Ans.*—He had his pistol, and from that time on he was drinking.

"*Ques.*—I want to know whether you said that."

"*Ans.*—Yes, sir.

"*Ques.*—Did'nt you say, in the presence of Judge Turney and Captain Donaldson—and put it in your bill—that he put his pistol in his pocket, and took up a stick and shook it a number of times over your head, cursing you and your family?

"*Ans.*—I did not say a number of times. He did not know what he was doing. That nor nothing else would have been in the bill if it had not been for the other trouble."

At this point the counsel for the defendant objected to the conduct of the witness, and asked the Court to instruct the witness "to confine herself to the questions and answers to them without these remarks." The reply of the Court was: "The Court has already ruled on that question. I take it that Mrs. McReynolds is doing the best she can in the matter." The counsel then said: "I want to make the point that she must be confined to the questions presented to her, and that every statement volunteered with reference to those

other matters is incompetent, and should be excluded. I ask your Honor to exclude every thing that has been said about her husband's character." By the Court: "Her explanations ought to be confined to her own case. The objection is very well taken. Let all testimony be excluded except answers to direct questions and personal explanations."

The ruling of his Honor that the witness, while admitting that she had made the impeaching statements, was entitled to explain why, how, and under what circumstances they were made, was unquestionably correct. Her credibility as a witness was being tested, and was the very thing in issue. If she admitted that she had made the impeaching statement, without more, her credibility was destroyed; whereas, she might be able, if allowed, to make such explanation as would save her credibility. It is the practice in this State to allow such explanations, and it is sustained by the authorities. 1 Greenleaf on Ev. (14th Ed.), Sec. 462, and note 1, with cases cited.

But it is insisted that the Court erred in not instructing the witness, upon the request of counsel, "to confine herself to the questions and answers to them, without these remarks." This request of counsel was made just after the answer of the witness in which she attempted to excuse the conduct of her husband, and the Court promptly excluded all of her testimony on this point, and instructed the witness that "her explanations ought to be confined to her own case."

We find also that in a previous part of her cross-examination, when the witness admitted having made an impeaching statement and said "but I will tell you why I would not have said it without cause," counsel for defendant objected "to any thing except an answer to our question;" and the Court said, "Answer any question Governor Marks asks you, and then if you desire to explain in reference to the matter you may do that."

This occurred before the witness had attempted to make any explanation for her husband, but was endeavoring to explain her own statements. As before shown, when she afterwards attempted to explain for her husband, the Court ruled it out and excluded it. But counsel further insists that the Court should have recited in so many words the excluded testimony and then excluded it. The answer to this is that no such request was made to the Court. The request of counsel was "to exclude every thing that has been said about her husband's character." The response of the Court was: "Her explanations ought to be confined to her own case. The objection is very well taken. Let all testimony be excluded except answers to direct questions and personal explanations." This all occurred in the presence of the jury and the witness, and there could have been no misunderstanding of what was meant. If the counsel desired the Court to incorporate in his ruling the exact language of the witness to be excluded, he should have so requested. Without such specific

request from counsel, the ruling of the Court was correct as made.

The next contention of counsel on this branch of the case is that the Court erred in using the language: "I take it that Mrs. McReynolds is doing the best she can in the matter." This occurred immediately after the objection made by counsel to the witness' attempt to explain and excuse the conduct of her husband. In this same colloquy between Court and counsel, the Court expressly excluded this testimony of the witness, so that the language used could not have been construed into an approval by the Court of the objectionable testimony. But counsel urge that this language of the Court had a very injurious effect upon the rights of the defendant in another aspect. The purpose of the cross-examination at this point was to test the credibility of the witness, and the contention is that the language of the Court, "I take it that Mrs. McReynolds is doing the best she can in the matter," was an indorsement by the Court of her credibility; that it was an expression by the Circuit Judge of his opinion that Mrs. McReynolds was a credible witness; that it was equivalent to telling the jury that, in the opinion of the Court, the witness was truthful and reliable. If this language of the trial Judge means what counsel contends that it means, and we can see that it might have affected the finding of the jury, it is our duty to reverse the case.

The trial Judge should always be extremely

careful not to express or intimate any opinion on
any fact to be passed upon by the jury. It has
been said by this Court: "It is natural that ju-
rors should be anxious to know the mind of the
Court and follow it; therefore, the Court cannot
be too cautious in his inquiries." *McDonald* v.
*State*, 5 Pickle, 164.

It becomes very important, then, for us to con-
sider the meaning of the language used by the
trial Judge and its possible effect upon the jury.
Plaintiff's counsel say that said language was not
an indorsement of the credibility of the witness,
but that defendant's counsel was pressing her most
ingeniously and pointedly on her impeaching state-
ments, while she was admitting the statements and
giving explanations of them; and that the language
of the Court referred rather to the intellectual
efforts of the witness to parry the thrusts of
counsel than to her good faith.

It does not appear affirmatively from the lan-
guage used by the trial Judge that he intended
his remark to refer to the intellectual efforts of
the witness, and the jury should not be required
to enter into refinements of construction in order
to give his language a hidden meaning. This
witness had given very damaging testimony against
the defendant, and much of it was in direct con-
tradiction of statements which she admitted that
she had previously made out of Court. Defendant's
cross-examination of her was being directed solely
to the impeachment of her credibility. The direct

question, then, in issue before the jury was, Is this witness telling the truth? At this critical juncture the trial Judge says, in the presence of the jury: "I take it that Mrs. McReynolds is doing the best she can in the matter." Whatever purpose his Honor may have had in his own mind, we think that this declaration, made at this time and in this connection, naturally imported a suggestion to the jury that the Court was of the opinion that the witness was testifying in good faith, and the jury could not reasonably place any other construction upon it. We are constrained to hold that his Honor was in error.

From this point the cross-examination of Mrs. McReynolds proceeded at great length. She was asked if she had not stated that her husband was continually after the plaintiff to swear her child to defendant, and "had threatened to blow her to hell if she did not." She started to answer by giving the reason why her husband had said it. Counsel stopped her, and the Court again told her that she could make any personal explanation she wished, but could not make any for her husband. She was then asked if she had not allowed plaintiff to go over to her father's, where John lived, after she knew of the improper relations between plaintiff and John. She replied that she had. She was then asked the difference between plaintiff's age and John's. Her answer showed that plaintiff was born in 1866, and was twenty years old when her child was born in 1886. The wit-

ness had previously spoken of plaintiff as a child. Then followed this question and answer:

"*Ques.*—You say she was a child, and I want to see if you are mistaken."

"*Ans.*—She was a child in ways and manners, and as innocent as any child. John almost raised her, and I taught her to love and respect him."

Defendant's counsel here asked "the Court to instruct the witness to answer my questions and volunteer no information outside." There was no response from the Court. This is assigned as error. This answer was a personal explanation, which the Court had already ruled that she had a right to make. The questions were intended to throw discredit on the witness by showing that she had allowed plaintiff to go to John's home after she was a full-grown woman and after she (the witness) knew of their improper relations. Having answered that she did allow her to go, it was not improper for her to state any fact in explanation of her conduct. Whether the explanation was sufficient to excuse her conduct was a question for the jury.

After the cross-examination of Mrs. McReynolds had been finished, plaintiff's counsel asked her this question: "After this suit was brought, state whether or not there were any efforts made to induce the plaintiff to swear that the child was not the child of John Graham." Defendant's counsel objected, on the ground that it was original matter, and no ground had been laid for its introduction then.

The Court overruled the objection, and allowed the witness to answer the question. The answer of the witness was: "Captain Donaldson said if we could get her to swear that it was not his, that he would get George Alley to go over and go back of the garden and swear her that it was not John's, and then he would keep it until Court and then read it."

The action of the Court, in allowing this question to be asked and answered, over the objection of defendant's counsel, is assigned as error.

It will be observed that this question is general in its terms, and calls for "any efforts," no matter by whom made. If the question had called for efforts made by the defendant, or any person authorized by him, to induce the plaintiff not to swear the child to him, it would have called for proof of great importance to both parties. The objection of defendant to the question was upon the ground that it was original matter, and that no ground had been laid for its introduction. This ground is not tenable. It is within the discretion of the Court to allow original matter of a proper character on re-examination. *Railroad* v. *Mitchell*, 11 Heis., 408.

It is argued before us now with great force that the question was incompetent, because it did not call for efforts made by the defendant, and did not in any way connect him with such efforts, and was an attempt to bind him by the action of outside persons, who were not authorized to bind him.

But no objection was made to the question on this ground, in the Court below, and it cannot be made here.

One other error is assigned to the action of the Court below, in relation to the testimony of this witness. Plaintiff's counsel asked her: "What induced you to go back to your husband?" This was objected to by defendant's counsel. The objection was overruled, and the witness answered: "I thought it was my duty to go back to him and her, and do my duty by them." The objection to this question stated no ground, but was general. The question and answer were immaterial, but we cannot see that the defendant has been, or could be, prejudiced by it.

Much more of Mrs. McReynolds' testimony is quoted in the brief of appellant's counsel, ·and errors are assigned upon it, but no objection was made to it in the Court below, and we do not notice it here.

Error has been assigned to the action of the Court upon the testimony of the plaintiff.

On her cross-examination, certain notes were handed to her by defendant's counsel, which she identified as the notes she had written to her step-mother, Mrs. McReynolds, during the time that Mrs. McReynolds and her husband were separated. The plaintiff claimed the word "erth" had been scratched out after the notes were sent by her. Defendant's counsel was endeavoring to show by the witness that she herself had erased the

44—6 p

word "erth" because she had spelled it wrong.
The Court interposed, and said: "It strikes me
this is immaterial." It is claimed that this was
error. An examination of the note shows that the
word was written twice. Once it was spelled
"erth" and once "earth," and they were both
written immediately adjoining each other. The
"erth" was scratched by running a pen through
it. We agree with the Court that it was immate-
rial to show by whom the scratching was done,
as the scratching did not change the meaning of
the note, and could not have been done in bad
faith by any person.

Again, the plaintiff testified that she had a sec-
ond meeting with Dr. Cotnam; that the defendant
took her down to the Crutchfield place, about three
miles from his home, and left her in the woods,
while he went for Dr. Cotnam; that he brought
Dr. Cotnam to where she was in the woods, and
he examined her again. Defendant's counsel asked
the witness: "Did you see anybody on that trip?"
She answered that she thought she did, but could
not recollect who it was. The next question was:
"Where did you see them at?"

Then followed a number of questions as to
whether she saw the person as she was going or
coming back. Finally, the Court asked: "Did
you see anybody as you went down in the woods?"

The error assigned is that the Court, by this
question, assumed as a fact before the jury that
the plaintiff had gone down into the woods;

whereas, the contention of the defendant was that this entire story of her going to the woods, and of her second examination by Dr. Cotnam, was a fabrication.

We are referred to the case of *McDonald* v. *State*, 5 Pickle, 164, in support of this assignment of error. That was a criminal case, and the defendant testified in his own behalf "that deceased drew his hand from his pocket, and that he (defendant) thought he had a weapon." The Court asked: "Did you find any weapon in his hand or about him?"

It does not appear from the report of that case that the question whether the deceased actually had a weapon had been raised or suggested until the Court put the question. This Court commented with disapproval upon the action of the Court in asking the question, but declined to hold that it was error. The ground of the disapproval was that the question suggested to the jury that it was necessary to show the possession by the deceased of a weapon in order to make out self-defense; whereas, self-defense, under the law, was made out by showing that the accused honestly believed, upon reasonable grounds, that he was in danger of death or great bodily harm.

The question before us presents a different state of facts. Defendant's counsel had asked the witness whether she had seen anybody on the entire trip, and at what point on the trip she had seen them. The defendant was endeavoring to make

the witness say whether she had seen anybody on the trip. The question of the Court was in aid of defendant's endeavor, and did not suggest to the jury that the Court deemed it important whether the witness met the person in the road or as she went to the woods. But counsel insists that the question assumed as a fact that the witness went to the woods, and was equivalent to saying to the jury that she did go to the woods. We do not so understand it. The witness had just testified that she did go to the woods, and, at that time, there had been no countervailing proof. The question was based upon the proof as it then stood, but did not assume that it was true or false. Defendant's counsel himself had just previously asked the witness how long she remained in the woods, but this was no assumption or admission of the fact that she had been in the woods; and the question put by the Court was no assumption of such fact. It has been held by this Court that the trial Judge "is not a mere figure-head," and " may properly ask questions of the witnesses." *Hill* v. *State*, 5 Lea, 731; *Butler* v. *Boyles*, 10 Hum., 155. But the questions should be asked so as not to elicit illegal or incompetent evidence (*Sharp* v. *Treece*, 1 Heis., 448), and so as not to indicate to the jury any impression of the weight or importance his mind attaches to the testimony inquired about. *McDonald* v. *State*, 5 Pickle, 164.

It is next assigned as error that the Court,

over the objection of the defendant, allowed plaintiff to testify, on her re-examination, to acts of sexual intercourse with the defendant after she went to Winchester. The ground of the objection was that the sexual intercourse after she went to Winchester had not been inquired about on cross-examination, and that the testimony offered on the re-examination was original matter. It is not claimed that any incompetent testimony was let in by this action of the Court, but the objection is solely upon the ground that the testimony was original matter. It was within the discretion of the Court to admit this testimony, and we will not disturb his ruling.

Again, it is assigned as error that the Court permitted the witness, Dr. Mike Graham, to testify, on cross-examination, over the objection of the defendant, that the plaintiff told him, on the morning after the child was born, that the defendant was its father. The child was born at the house of the witness, in Stevenson, Alabama, and was born during the night. The conversation of the witness with the plaintiff occurred early the next morning. Defendant's contention is that this was a declaration of the plaintiff in her own favor, made after her cause of action accrued, and not in defendant's presence, and that defendant cannot be bound by it. The general rule contended for by defendant is unquestionably correct, but does it apply here? The plaintiff had testified before the jury that defendant was the father of the child. For the

purpose of impeaching plaintiff on this point, the defendant had introduced a negro woman—Charlotte Cooke—who attended the plaintiff during her confinement, and she testified that, on the same morning testified to by Dr. Graham, the plaintiff had told her that the father of the child was dead, thus indicating that defendant was not its father, as he was still living. The statement of the plaintiff, thus testified to by this witness, directly contradicted the statement of the plaintiff made on the witness-stand, and impeached the credibility of the plaintiff as a witness. It was to meet this impeaching testimony, and to confirm plaintiff's statement on the stand, that Dr. Graham was asked to state whether plaintiff had told him, on that morning, that defendant was the father of her child. Whether it was error for the Court to admit this confirmatory statement is the question which we are to consider. There is great conflict of authority on this question. In *Story v. Sanders*, 8 Hum., 666, Judge McKinney stated the rule as follows: "It seems to be the better opinion that a witness cannot be confirmed by proof that he has given the same account before, even though it has been proved that he has given a different account in order to impeach his veracity; for his mere declaration of the fact is not evidence;" and he quotes this rule from 1 Starkie on Evidence. He then proceeds: "And although, under *special circumstances*, exceptions to this rule have been ad-

mitted, the case under consideration does not form one."

The question again came before this Court in *Dossett* v. *Miller*, 3 Sneed, 76, where error was assigned to the ruling of the Court below, which ruling was as follows: "Where the credit of a witness is attacked, upon the ground that he had made statements inconsistent with the statements he had made in Court, that testimony might be heard to show that at other times and on other occasions the witness had made statements consistent with his testimony given in Court."

It will be observed that this is a broad statement of the rule, and is in conflict with the rule stated by Judge McKinney in 8 Hum., unless the facts of the case brought it within the exception of "special circumstances," stated by Judge McKinney; but the facts are not given, and we cannot see whether the "special circumstances" existed. In passing upon this ruling of the Circuit Judge, Judge Caruthers said: "Upon this question there is very great conflict in the authorities. In 1 Greenleaf, Sec. 469, such evidence is declared to be inadmissible unless where a design to misrepresent is charged upon the witness in consequence of his relation to the party or to the cause, in which case it seems it may be proper to show that he made a similar statement before that relation existed." This is a statement of the "special circumstances" which would take the case out

of the general rule as stated by Judge McKinney in the 8 Hum. cases.

Continuing, the Court said: "We think the case put by Mr. Greenleaf above is a proper one for the admission of previous consistent confirmatory statements, but would also allow it in all cases where the evidence given in Court is impeached by proving former contradictory statements." He then holds that there was no error in the ruling of the Court below.

In *Queener* v. *Morrow*, 1 Cold., 134, Judge McKinney, after stating the rule as given by Greenleaf, says: "The case of *Dossett* v. *Miller* sanctions the principle that evidence of previous consistent statements is admissible in all cases where the testimony of the witness, given in Court, is sought to be impeached by proof of contradictory statements." He then says: "The abstract principle announced we are not disposed to disturb," and proceeds to dispose of the case on that basis, but limits the consistent statements to those made antecedent to the impeaching · statements which they are intended to meet.

In *Bank* v. *Robinson*, 1 Baxter, 484, Judge McFarland quotes from and approves the cases of *Dossett* v. *Miller* and *Queener* v. *Morrow*, and approves the act of the Court below in admitting proof of the consistent statements of the witness, although the facts did not bring the case within the exception of "special circumstances."

In *Hayes* v. *Cheatham*, 6 Lea, 10, Judge Cooper

refers to the cases of 3 Sneed, 1 Coldwell, and 1. Baxter, and says the rule is: That where it "is sought to destroy the credit of a witness by proof of contradictory representations, evidence of his having given the same account of the matters, at a time when no motive existed to misrepresent the facts, ought to be received, because it naturally tends to inspire confidence in the sworn statement." The facts of that case brought it clearly within the exception of "special circumstances."

In *Glass* v. *Bennett*, 5 Pickle, 481, Chief Justice Turney quoted the rule as stated in the 6 Lea case, and held that proof of consistent statements were properly admitted. It did not appear in that case that the facts brought it within the exception of "special circumstances," but it came within the broad rule laid down in *Dossett* v. *Miller*, and re-affirmed in *Queener* v. *Morrow* and *Bank* v. *Robinson*. Our conclusion is that, whatever may be the rule in other States, and whatever might be our view of the question as an original question, the rule in this State is, that previous consistent confirmatory statements, made before the impeaching statement, are admissible in all cases where the evidence given in Court is impeached by proving former contradictory statements.

In this case it does not clearly and definitely appear whether the statement made by the plaintiff to Dr. Graham preceded that made to the witness, Charlotte Cooke; but it does appear that both statements were made on the same day, very

early in the morning, and we think it is fairly inferable, from the proof, that the statement to Dr. Graham was made first. The result is that it was not error to allow Dr. Graham to state what the plaintiff told him in relation to the paternity of her child.

Error is assigned to the action of the Court in relation to the testimony of Charlotte Cooke. As before stated, this witness was examined before the jury, and testified to a conversation she had with plaintiff the morning after her child was born. She states that she asked plaintiff who was the father of the child, and plaintiff replied: "The one that done it is dead. You seen him right here at Uncle Mike's."

The *deposition* of this witness had been taken by defendant in April, 1890, more than a year before the trial, but was not offered or read by him on the trial. On her cross-examination before the jury the plaintiff's counsel produced her deposition and had her to identify it, and proved by her that it was read over to her at the time it was taken and again about two weeks before the trial; but neither party asked her any questions about the contents of the deposition, or whether there was any mistake in it. The deposition was *ex parte*, and is in substantial accord with her oral testimony, except in one very important particular. The deposition shows that the witness asked the plaintiff who was the father of the child, and that plaintiff's reply was " one's dady done it" instead

of "the one that done it is dead," as stated in her oral examination.

Defendant then called Col. W. L. Eakin, and proved by him that he was the counsel who took the deposition, and offered to prove by him that the statement of the witness to the Justice of the Peace before whom her deposition was taken, was identical with her statement before the jury. Plaintiff's counsel objected, and the witness was not allowed to testify. This is assigned as error. The witness was ignorant and illiterate, and had been a slave, and signed her deposition with her mark. The certificate of the officer shows that he reduced her answers to writing. The statement of the deposition was read to contradict her statement made on the witness-stand, and the purpose of Colonel Eakin's testimony was to meet this contradiction by showing that the witness did not make the impeaching statement shown in the deposition, but that her statement then was the same she had made before the jury, and that there was a mistake made by the officer in transferring her answer to the paper.

We have already shown that where the impeaching or contradictory statement is not on oath the witness may be sustained by proving previous confirmatory statements; and much more may the witness be sustained by proving that the impeaching statement was never made at all; and if this proof can be made by some other person than the witness himself, it will be so much the more sat-

isfactory. But the impeaching statement we now have to deal with is a statement under oath and in a deposition, though not written by the witness. Will the same rule apply in this case?

In *Bounds* v. *Schwab*, 5 Sneed, 594, the impeaching statement was made under oath in an oral examination in another case, but in reference to the same transaction. Afterwards the deposition of the witness was taken, and his testimony did not agree with his previous testimony in the other case; but his attention was not called to his previous testimony so as to give him an opportunity to explain it. It was then sought to impeach his deposition by proving his previous contradictory testimony. It was held that this could not be done, because his attention had not been called to the previous testimony so as to give him an opportunity to explain it.

In *Nelson* v. *State*, 2 Swan, 259, the impeaching statement was contained in the testimony of the witness given before the committing Magistrate, and reduced to writing by the Magistrate, and signed by the witness. It was held that this impeaching statement was not admissible to contradict the witness unless his attention had been called to it, and opportunity given him to explain it.

In *Hammond* v. *Dike*, 4 Minn., 273 (18 Am. State Rep., 506), the impeaching statement was contained in a deposition, and the same rule was applied as in the Tennessee cases.

In the case at bar, as before stated, the at-

Graham *v.* McReynolds.

tention of the witness was not called to the impeaching statement contained in her deposition, as it should have been, and she was given no opportunity while on the stand to explain it. But defendant's counsel made no objection to the admissibility of said deposition, and have assigned no error here, so we must treat the deposition as in evidence. The deposition having thus been admitted without giving the witness an opportunity to explain the impeaching statement, the question then is, Was the testimony of other persons who knew the facts admissible to make the explanation which she had no opportunity to make? If so, then what better explanation could be made than to show that the impeaching statement had not been made at all? If the witness had been given an opportunity to explain, and had explained by denying that she made the impeaching statement, it is clear that this denial might have been supported and corroborated by the testimony of other persons who knew the facts; and there is no reason why this outside, unbiased testimony should not be allowed when no such opportunity was given her. On the contrary, both reason and justice demand it.

We are confirmed in this view by the fact that the language of the deposition—" one's dady done it"—is without meaning, and bears on its face evidence of mistake. Moreover, defendant's counsel was present at the taking of the deposition, and we cannot assume that he would receive

such a meaningless answer from the witness with-
out requiring some explanation; because it is evi-
dent that his only purpose in taking the deposition
was to prove some admission of the plaintiff as
to the paternity of her child which would excul-
pate his client. Moreover, the language used before
the jury was, "The one that done it is dead."
She might have expressed the same meaning be-
fore the Magistrate by saying the "one's dead
that done it." This would have sounded very
much like "one's dady done it"—the language
used in the deposition. The similarity in the
sound of the two expressions might well have
caused the Magistrate to make a mistake in writ-
ing down the answer, and might well account for
the failure of the witness and the counsel to notice
the mistake when the Magistrate read the deposi-
tion over to the witness.

We think the trial Judge should have admitted
the testimony of Colonel Eakin.

Error is assigned to the action of the Court in
allowing the plaintiff to put in evidence a number
of letters written to her by Hope Graham, Jr.
These letters are part of a correspondence carried
on between Hope Graham, Jr., and the plaintiff
while she was at school in Winchester. The 'de-
fendant had introduced and read the letters from
the plaintiff to Hope Graham, Jr., to show that
plaintiff loved him, and not John Graham, as she
had sworn in her testimony. The Court admitted
the letters of Hope Graham, Jr., for the purpose

of explaining her letters to him, and expressly limited them to that purpose alone. This was certainly no error against the defendant.

It is assigned as error that the Court overruled the defendant's motion to dismiss the suit for maintenance. We think there was no error in this action of the Court. At the time the suit was brought, plaintiff was an unmarried woman, living with her father. Defendant claimed, and there was proof tending to show, that her father instigated the suit, and urged her to bring it, and was maintaining it for her. This he had a legal right to do. He was her father and protector, and she was a member of his family.

Code (M. & V.), § 2451, exempts from the operation of our champerty and maintenance laws "the exception contained in the ancient law." The ancient exception is: "A man may maintain the suit of his near kinsman, servant, or poor neighbor, out of charity or compassion." 4 Blackstone, 135. Our statutes go further, and expressly authorize the father to bring a suit for the seduction of his daughter, even where there has been no loss of service. Code (M. & V.), § 3502.

A number of other errors are assigned, all of which we have carefully examined, but we do not consider it necessary to pass upon them in this opinion. We have passed upon the questions which we have deemed important, and those which are likely to be involved in another trial of the case.

For the errors indicated, the judgment of the

Circuit Court is reversed and the case remanded for a new trial.

### DISSENTING OPINION.

LEA, J. I agree with the result reached and announced by the Court in this case, but I do not agree to the proposition announced in the opinion that a man is guilty of seduction if he persuades a woman to yield to sexual intercourse. There must be some device, artifice, or false or fraudulent promise. Mere persuasion, which may be by asking her to yield, is not seduction.