# J. G. WHITFIELD v. C. D. LOVELESS.

Middle Section. August 29, 1925.

Certiorari denied by Supreme Court December 12, 1925.

1. **Appeal and error. Weight of evidence is for jury.**

The appellate court must accept the finding of the jury on issues of fact where there is any material evidence to support their findings.

2. **Appeal and error. Evidence and inferences therefrom are taken in most favorable light to plaintiff on appeal from judgment for him.**

Where defendant urges on appeal that there is no evidence to support the verdict of the jury he must take as true the strongest legitimate view or construction of the testimony against him and show that it affords no support for the finding of the jury.

3. **Appeal and error. Evidence held to sustain verdict of jury.**

Upon examination of evidence, held sufficient to support verdict of jury.

4. **Damages. Verdict of $7,635 for permanent injury held not excessive.**

In action for injury sustained in automobile accident in view of evidence as to' nature and extent of injury and suffering and perhaps permanent unfitness of plaintiff, held $7,635 not so excessive as to indicate passion and prejudice of jury.

5. **Evidence. Testimony as to speed of car four miles from accident, held too remote.**

Where witness was offered to testify he had seen a car like one in accident four miles away from place of accident, held evidence to be too remote to be of any value and its rejection was not error.

6. **Trial. Argument of counsel held not reversible error.**

Statement by plaintiff's counsel in argument referring to defendant's millions and saying he could pay a judgment of $25,000 without an effort and where court told jury that wealth of parties did not make any difference, held, not reversible error.

7. **New trial. Communication with jury. Conversation of a witness with a juror not such as to constitute grounds for a new trial.**

Where witness met one of jurors at lunch hour and made remark that both plaintiff and defendant were rich men but one was the friend of the poor man and other of the rich man but said nothing about merits of the case, and upon being informed by juror that he was on the jury the witness said no more, held not ground for new trial.

8. **New trial. Misconduct of juror. Not reversible error for one of the jury to state to the jury while considering their verdict that most men now carry liability insurance.**

Where affidavit of ten jurymen stated that the juror only made a casual remark "that most business men now carry liability insurance" and that they were not influenced by the statement in arriving at their verdict, held that trial court did not err in refusing to grant a new trial.

9. **New trial. Newly discovered evidence, held not of such material character as to warrant a new trial.**

Where affidavits of newly discovered evidence showed that the evidence did not contradict any evidence in the case but might be reconciled with it, held not ground for a new trial.

10. **Evidence.** Negative evidence of little value to contradict positive evidence.
   Where witnesses have positively testified to facts as existent, the statement of witnesses to the effect that they did not notice or see them, especially when they were not looking for them, is of little, if any, material value.

11. **New trial. Newly discovered evidence.** New trial will not be allowed in order to introduce evidence which party became aware of during the trial.
   If party or his counsel become aware of available testimony during trial of the cause, they will not be allowed a new trial in order to introduce witnesses whom they could have introduced at the trial.

Appeal in Error from Circuit Court, Maury County; Hon. W. B. Turner, Judge.

Affirmed.

J. C. Voorhies and R. S. Hopkins, both of Columbia, for plaintiff in error.

W. S. Fleming, Sr., J. B. Garner, W. S. Fleming, Jr., all of Columbia, for defendant in error.

DeWITT, J. This was an action for damages for injuries to the person and an automobile of the plaintiff below, C. D. Loveless. In this opinion the parties will be referred to as they stood as plaintiff and defendant in the trial court. The injuries resulted from a collision between the two automobiles of the parties on February 17, 1923, on the highway about seven miles north of Columbia, Tennessee. Plaintiff was driving his Franklin car northward from Columbia, toward his home at Spring Hill. He was alone in his car. Defendant, J. G. Whitfield, was driving his Dodge coupe southward, having with him in the car Miss Cordie Hardison and defendant's adopted little girl, who was sitting between them. The collision occurred on a hill which slopes northwardly, so that plaintiff was going down hill and defendant was going up hill, not having quite reached the crest of the hill. The accident occurred shortly after four o'clock in the afternoon.

The jury returned a verdict for $8500. The trial judge suggested a remittitur of $865, which was accepted by the plaintiff under protest but no complaint is made of the same by plaintiff in this court. Defendant's motion for a new trial was overruled by the court and a judgment was rendered against defendant Whitfield for $7635, and costs, from which he has brought this appeal in the nature of a writ of error and has made numerous assignments of error.

The declaration contains four counts.

In the first count it is averred that defendant negligently drove his automobile against the automobile in which plaintiff was riding, with such force and violence that plaintiff's automobile was wrecked and overturned and damaged to the amount of $1800 and plaintiff

received the following injuries to his person: six ribs and his collar bone were broken and his head, back and shoulder injured; he was rendered unconscious and was confined to his home for a period of several weeks under the care of a physician and trained nurse; he lost the full use of his right arm and suffered, and still suffers great bodily and mental pain and anguish, is permanently injured, and his expenses incident to said injuries to his person amount to $135.85.

In the second count he avers that defendant was driving his car at a rate of speed in excess of twenty miles per hour in violation of the law, and that by reason of the negligence of the defendant, plaintiff's automobile was thrown violently off the highway, overturned, wrecked, and the aforesaid damages to person and property were incurred.

In the third count he avers that he, the plaintiff gave, the defendant more than half the road and drove off of the asphalt in the east margin thereof, nevertheless defendant carelessly and negligently turned to his left instead of keeping to his right and thus giving half of the road provided and required by the statute laws of Tennessee, of every person, having charge of any vehicle in meeting and passing another vehicle; crossed to the side the plaintiff was on and where plaintiff had a right to be, and so required by the statute law of Tennessee to be, and drove his car into the side of plaintiff's car and overturned it causing the damages aforesaid.

In the fourth count he avers that as he was traveling in the northerly direction and was on the right hand side of the road, he saw the defendant approaching from the opposite direction in his automobile, at which point the highway is on an approach sloping from south and north, said grade being slight, the asphalt portion of said highway at this point being twenty feet wide with shoulder on either side thereof about four feet wide, and a drain ditch on either side of the shoulders and between the fences bordering the highway at this place; that when defendant reached a point about fifty feet distant from him he swerved his car from his, defendant's side of the road and came directly toward plaintiff who was on the right hand side of the road, whereupon plaintiff in order to avoid being struck by defendant swerved his car to the right to such an extent that he even ran his right front wheel off of the asphalt portion of said highway and on the shoulder of said road on his right, but that in spite of every effort on the part of plaintiff to avoid being struck, the defendant did drive his car with great speed and violence into the running board of plaintiff on the left side and against the left rear wheel whereby plaintiff's car was overturned and plaintiff was thrown violently to the ground, suffering the injuries aforesaid; that defendant's car with the left front wheel taken

from the axle proceeded with the axle dragging on the asphalt from the place where it struck plaintiff to the edge of the asphalt, then across the shoulder and the ditch, severing a wire fence and plowing up the ground in the field bordering the east side of the highway, where it finally stopped; that the injuries were the proximate result of defendant's negligence and wrongful conduct.

To this declaration the defendant interposed a plea of not guilty. The first assignment of error is that the trial judge erred in overruling defendant's first and second grounds assigned in his motion for a new trial.

First, because there is no evidence to support the verdict of the jury.

Second, because the evidence introduced upon the trial of the cause greatly preponderates against the verdict of the jury.

The second ground aforesaid cannot be considered here because under the rule of long standing the appellate court must accept the finding of the jury on issues of fact where there is any material evidence to support that finding, and must take as true the strongest legitimate view of that evidence supporting the verdict, and disregard the countervailing testimony. Chattanooga Machine Co. v. Hargraves, 3 Cates, 476; Lumber Co. v. Banks, 10 Cates, 627; Railroad v. Hunter, 4 Higgins, 465. It is necessary, therefore, that the plaintiff in error take as true the strongest legitimate view of construction of the testimony against him and show that it affords no support for the finding of the jury. Railroad v. House, 96 Tenn., 552; Citizens Rapid Transit Co. v. Seigrist, 96 Tenn., 119; Machine Co. v. Compress Co., 105 Tenn., 187; Railroad v. Witherspoon, 112 Tenn., 128; Wilson v. Alexander, 115 Tenn., 125; Lumber Co. v. Banks, 118 Tenn., 687.

Adhering, as we must, to this rule, we can only consider such evidence as, when believed by the jury, would entitle the plaintiff to recover. It is true that this voluminous record contains much countervailing evidence; in fact, the evidence is very conflicting upon all the crucial issues. The trial judge has approved this verdict. His position is that of a thirteenth juror, because it was his duty to approve or disapprove of the verdict of the jury according to the weight of the evidence. His position in this regard is quite different from that of the appellate court. Counsel for defendant are, of course, familiar with this rule, but they have argued the case extensively, in their briefs and at the bar, as if it were permissible for this court to weigh all the evidence; and we indulge in this particular discussion with great respect for their zeal and ability.

We will now consider the first ground of this assignment of error that there is no evidence to support the verdict.

There were four witnesses who testified that they saw the collision—the plaintiff, C. D. Loveless, the defendant, J. G. Whitfield, Miss Cordie Hardison and a negro named Osborn Lawrence. There is a large amount of testimony as to surrounding circumstances, including many physicial facts.

The plaintiff C. D. Loveless testifies that shortly after four o'clock in the afternoon he left the mule barn in Columbia which was his place of business, and began driving his Franklin car toward his home situated a half or three-quarters of a mile south of Spring Hill, which is eleven miles from Columbia; that on the Mangrum Hill, about five or five and one-half miles from Columbia he passed Miss Ruth Parks who was going northwardly driving a Chevrolet car; that she had passed him at Billington's Store; that Mangrum Hill is about a mile and a half from the scene of the accident; that he was running at his usual speed of about twenty miles or twenty-five miles an hour; that when he had just past the crest of the hill and while running on the east side going north he first observed the car of defendant Whitfield coming toward him, the cars being about one hundred yards apart; that when they got in about sixty feet of each other defendant's car was in the center of the highway as near as he could tell, running very fast; that defendant made a turn to the left instead of to the right, that he, the plaintiff swung a little to the right toward a gully and that the defendant coming diagonally toward the east side in a gradual turn swinging to the left struck his left front wheel against the left front hub of plaintiff's car, over on the east side of the highway; that this threw plaintiff's car around and it skidded sideways running on the two right wheels and turned over. He says the skid occurred on the shoulder, that is, the ground just outside of the asphalt portion of the highway and began shortly after the impact; that there was grass growing on the shoulder and this grass was torn up. On cross-examination he said that defendant at a distance of fifty or fifty-five or sixty feet turned abruptly from his side of the road coming up the road into the center; that he was in the center when plaintiff got in this distance from him; that he, the plaintiff pulled out to the extreme right when he saw that defendant was turning to the left instead of to the right; that his right front wheel and right rear wheel were both off the asphalt before plaintiff got to him; that the right front wheel was about eighteen inches off the asphalt and the back wheel probably a little less than that. He further says that defendant's car was running twenty-five, maybe thirty miles an hour; that defendant's car first hit plaintiff's hub cap and hub, went under the back part of the front fender and the running board and went on back against the left rear part of his car.

The negro Osborn, or Oz Lawrence, as he is called, testified that at that time he was living on his own place on the highway about six miles north of Columbia; that he was thirty-four years old and had lived in that neighborhood since he was a boy; that he saw the collision; that he was on the west side of the highway in a field walking toward his home from a rabbit hunt; that he had two rabbits, a gun and two dogs with him; that the point where he was in the field was south of the intersection of the highway and the Green Mill Road where the accident occurred; that as the defendant in the Dodge car was passing him the defendant motioned to him with his thumb in a backward direction; that the car going toward Columbia was on the west side of the highway; that he, the witness was not far from the fence on the western boundary of the highway in the field road that runs by the fence, that just a little bit after the said gesture was made the following occurred, quoting from the testimony:

"Q. 39. Just tell exactly what occurred when the small car passed? A. Why it kinder turned seemingly a little slanting that way and hit the big car about the front wheel, but didn't hit so hard, but the hind wheel is where it hit the hardest, and the big car it turned completely over and hit back upon its wheels just as it was, the engine was running fast and give right smart smoke like it was going to burn up.

"Q. 40. The Franklin car? A. Yes sir.

"Q. 41. After it turned over? A. Yes sir, and turned back upon its wheels.

"Q. 42. Before it turned over, did it turn over immediately, or go down the pike some distance before it turned over? A. Went down the pike a little.

"Q. 43. How did it go down the pike? A. Turning up that way.

"Q. 44. Sideways? A. Sideways.

"Q. 45. Going down the pike sideways or frontways? A. It went sideways turning that way, hitting the hardest behind, went sliding down that way and turned on over at the time.

"Q. 46. You say that the small car angled over toward the big car and hit it about the front wheel first and then the hind wheel, is that right? A. Yes.

"Q. 47. What direction did it angle toward it, the little car, what direction did it go? A. It went out east I think.

"Q. 48. Was the big car on the east side of the center of the pike or not? A. Yes, it was on the east side.

"Q. 49. Was the little car also on the east side of the center of the pike when the collision occurred? A. Well it was not on the side but over the center, the inside wheels.

"Q. 50. The wheels next to you was a little bit from the east of the center of the pike? A. No sir, the wheel on the east side was on the inside of the pike.

"Q. 51. And both parties at the time of the collision were on the east side of the pike? A. Yes sir.

"Q. 52. Now did that car, the big car turn over immediately or was it going down the pike some piece before it turned over and hit on its wheels? A. Went down the pike a little bit before it turned over.

"Q. 53. Did you notice just exactly how it acted when it went down the pike—just describe to the jury what you saw there. A. No more than just sliding by, turning up and turning on over.

"Q. 54. Once? A. Yes, one time.

"Q. 55. Where did the little car go after it hit the big one? A. I saw the little car up kinder end over in the field, but I didn't pay any more attention to it until after it passed by the large car.

"Q. 56. When you next saw it it was in the field on the east side of the pike? A. Yes sir."

He further testified that he got over the fence and went to the scene of the wreck; that the Franklin car had the two front wheels upon the asphalt and the two hind wheels off on the shoulder; that Mr. Loveless was lying on the ground on the south side of the car with a car wheel standing between his legs, which were crossed. On cross-examination he stated that he was about sixteen or eighteen feet from the scene of the wreck at the time the car passed.

The defendant J. G. Whitfield testified that before he got up the hill he noticed the negro in the field and that he was seventy-five or one hundred feet from the fence; that he paid very little attention to him but that his back and shoulder were a little toward the defendant. He denies that he made any gesture as stated by Lawrence. Miss Cordie Hardison testified that she saw the negro on the west side of the pike going southward; that she did not pay any particular attention to the distance of the negro from the highway but that he was a little way over in the field; that his back was toward them; that he had some rabbits and a gun; that the Dodge car was coming along the west, or right hand side of the highway; that she was so much excited that she could hardly tell what occurred when the collision happened; but that defendant's car went on across the pike to the east, over the fence and into the embankment. She said that they were on the west side at the moment of the collision; that she did not think that the defendant drove across to the other side of the road and into the plaintiff's car, but he could not have done so without her noticing it. She says that she does not recall when they passed the negro; that she and the little

girl noticed the rabbits he was carrying and were talking about them; that the little girl called her attention to the rabbits; that she was not looking forward and did not see the plaintiff's car until it was at the point of the accident; that she was still looking in the field when the accident occurred as she has a habit of watching the landscape and never watching the pike. She said that as she was looking away from that time on she did not know whether Mr. Whitfield had slowly and gradually gone further toward the east or not, but if he would have gone very far she would have noticed it.

On cross-examination Oz Lawrence was asked if he did not immediately after the accident go by the home of Mrs. Blackburn and tell her that he did not see the collision. He said that he did not say this to her. Mrs. Blackburn was introduced as a witness but she was not asked, and she did not testify as to this feature of the conversation. She did say that Oz Lawrence told her that plaintiff was drunk but he denies this and says he told her that he was sure that it would be said that he was drunk. In view of some effort to discredit Oz Lawrence, especially by testimony in contradiction, a number of white citizens were introduced and testified that they had known Oz Lawrence for many years, knew his general reputation for truth and veracity and that they would believe him on oath. There was no testimony to the contrary.

It is the theory of the plaintiff in endeavoring to account for such a strange performance on the part of defendant as he claims, in suddenly turning to the left across the center of the highway and striking plaintiff's car, that the defendant momentarily must have allowed his attention to be distracted from the road directly in front of him to the negro in the field with the gun and the rabbits, and especially by the reference to the negro in the conversation going on between Miss Hardison and the little girl; that this momentary distraction caused the defendant to lose a firm hold on his steering wheel and to make an unfortunate turn to the left and to fail to notice the plaintiff's car coming over the crest of the hill and down the hill. This is the only really rational explanation that is given, for the defendant is shown to be a man of unusual intelligence, a successful business man and a man of experience in the operation of automobiles. The facts above given as to the negro as a factor in the situation are all that the record discloses as bearing upon any such erratic conduct of the defendant, nevertheless, in addition to the positive testimony of the plaintiff and the negro as eye witnesses to the accident, there are many physical facts such as the marks on the asphalt road, which will be treated hereafter.

It is the theory of the defendant that the plaintiff was intoxicated, that he was running wildly, negligently and recklessly along the

road at a very high rate of speed; that the plaintiff ran over on the west side very rapidly, his car bouncing, and ran into the defendant's car striking the hub of the left front wheel, knocking the wheel off, letting the end of the axle down on the asphalt, causing the car to go on its own momentum, free from any possible control of defendant, in a curved line over to the east side beyond the asphalt, across the shoulder and through a wire fence where it stopped on the east side of the road.

The plaintiff admits that he had in his hip pocket a small half pint bottle of whiskey, which he was carrying from his office in Columbia, home to his wife who was ill with influenza. He says that he had not taken a drink of liquor at any time during that day and that he was not in the least under the influence of liquor. The bottle of whiskey was broken in the accident, the liquor was poured out into plaintiff's clothes and on the ground. Several witnesses testify that when they arrived there just after the accident they smelled the whiskey and thought at first that plaintiff was drunk; but that he was rendered unconscious by the accident and when he finally began to talk he was so dazed by the shock and injury that his conduct and conversation, while they might have been that of a drunken man, were also such as a shocked and dazed man might have exhibited. They say that they do not think that he was under the influence of liquor. There is some testimony that Miss Ruth Parks who arrived there a few minutes after the accident, stated to several people that Mr. Loveless was drunk, but she denies that she made any such statement and the jury evidently believed what she said. She says that the last time she saw Mr. Loveless' car in front of her before the accident she was not going rapidly and he was not gaining on her, that is getting further away from her, that he was not going rapidly. She says that when she arrived at the scene of the accident Mr. Loveless was lying on his side totally unconscious with one foot drawn back under him and the front wheel between his feet; that the negro was there; that Mr. Whitfield's car had passed into the field through the fence; that Mr. Whitfield in her presence told Mr. Loveless that he was in no condition to be on the highway, that he should go home and wait and he would talk to him; that Mr. Loveless was taken home by Davis Hays and a boy named Flowers, who had driven up from toward Spring Hill; that Hays and Flowers turned their car around on the highway by running a short distance, backing and going back northward on the east side of the pike. As aforesaid she denies that she said to Mr. Whitfield or Davis Hays or to Mrs. Dock Crow that Mr. Loveless was drunk and she was scared nearly to death. Now it may be that in her excitement she made some remarks to this effect, but the jury evidently believed that Mr. Loveless was not under the

influence of liquor, and that even if Miss Parks and others said then and there that Mr. Loveless was drunk, they were merely misled by the smell of the liquor in the bottle which had been broken in the accident. A great many witnesses testify that they were with the plaintiff at Columbia for sometime before he left the mule barn; that he was absolutely sober and wholly free from liquor. There is some testimony that Henry Pointer said that just before Mr. Loveless left the mule barn he took the bottle of liquor out of his safe; that he, Pointer said to Mr. Loveless that he had promised not to drink any more, but that Mr. Loveless said that it was cold and he must have a drink; but Henry Pointer denies that Loveless told him it was cold and he must have a drink. He says that Loveless did take the bottle of liquor out of the safe in his presence; that he did not take any drink out of it. Of course it is possible that Loveless took a drink out of the bottle after he left his place of business and when he was alone in the car; but he testified that he did not do so and the jury evidently believed that this was true, not only from his statement, but from the statements of all the other witnesses.

Doctor Woodard, who attended Mr. Loveless immediately after the accident at his home, testified that he could not smell any whiskey on his breath. Davis Hays testifies that both he and Miss Parks thought that Mr. Loveless was drunk but this was based on the smell of liquor at the scene of the accident.

Clem Campbell, an automobile service man and mechanic, testifies that he arrived at the scene of the accident about three quarters of an hour after it occurred. Henry Pointer went there on the next morning and went back there two days later with Davis, Clem Campbell, Maury Wells and Percy Bunch. Pointer and Campbell testify that they made a careful examination of all the marks on the road and the side of the road which indicated the position or movement of the cars. On March 12, 1923, they accompanied C. J. Akin, a civil engineer to the place and pointed out to him all of these marks and tracks. From a careful examination then and there made Mr. Akin made a map purporting to show all of these marks, or tracks, and this map is a part of the record. This map shows that at a point on the east side of the highway more than halfway from the center to the edge of the asphalt there began two white lines, or scratches in the asphalt which ran parallel to each other and about three or four inches apart for a distance of nine feet. The plaintiff claims, and Campbell and other witnesses testify, that these marks must have been made by the spindle nut and bolt on the left end of the axle of defendant's car after the wheel had come off. Davis, Campbell, Pointer, Read, Russell and Davis Hays testify that they were all there shortly after the accident and examined

the marks, and that the car tracks of defendant's car were distinct, running from a point about the center of the pike, verging and curving gradually toward the east and his left hand side of the road, and merging in the two marks made by the spindle nut and bolt before he entered the field. All of these witnesses testify that there were no such marks on the other side of the highway; that the evidences of the accident, the debris, glass, tracks, the skid and marks on the asphalt were all on the east side of the road and none on the west side. This is also attested to by the plaintiff and the witnesses Wells, Flowers, Lawrence, Miss Ruth Parks, Frank Harrison, Roddy, Curry and Whitaker. Many of them testify that between the beginning of the two scratches in the asphalt and the beginning of the skid on the shoulder were pieces of lineoleum and splinters from the running board of plaintiff's car; that this debris was just east of the north end of the two nine foot marks made by defendant's spindle bolt and nut. They also testify that just south of where the plaintiff's car finally stopped and at the end of the asphalt was a lot of glass. A number of witnesses testify that in one, or both of the right wheels of plaintiff's car was some grass caught between the rim and the casing. This would indicate that the car did turn over on the grass growing on the shoulder east of the highway. The witness Campbell testifies that on the Monday after the Saturday on which the accident occurred, Whitfield the defendant said to him in the presence of Frank Harrison that the accident occurred at the point where the white parallel lines or scratches in the asphalt began. In this he is corroborated by Harrison. This statement is denied by Whitfield, and on the motion for new trial he offered to prove by two witnesses that at the time when this conversation was said to have occurred in Columbia he, Whitfield, was at his home looking after his stock around the barn.

The map furnished by C. J. Akin is sustained as a correct map by the testimony of the plaintiff and a large number of witnesses, in fact all of these witnesses just mentioned, including Miss Ruth Parks. The deposition of C. J. Akin was taken in Florida and very minutely explains the map, the various elevations and the slope of the highway. The parallel marks made by the spindle bolt and nut were clearly visible to him on March 12, 1923.

Now if the witnesses for plaintiff who saw the accident are mistaken, it is very difficult, even discrediting their testimony, to reconcile all of these physical facts, these marks on and near the highway, with any theory that the collision could have occurred on the west side of the highway. The utter absence of all marks on that side, the presence of all the debris over on the east edge of the highway; the continuous track running from about the center of the highway into the beginning of the two parallel lines made by

the spindle bolt and nut; and the fact that the defendant's car was only injured in the left front wheel to any material extent, would abundantly warrant this court in holding that there is material evidence that this accident occurred by the defendant driving his car into the left side of plaintiff's car and causing the accident. There is testimony by two persons claiming to be experts that they tried for an hour to run a Dodge Coupe into the left side of a Franklin car in the precise manner claimed by the plaintiff and without success; but even this testimony to which the jury evidently did not attach much weight, does not conclusively show that the collision might not have occurred by the Dodge car striking the Franklin car at such an acute angle as to cause it to tear up the left side of the Franklin car in the manner shown, without doing further injury to the Dodge car.

The defendant introduced into the record a map made by Mr. McKissick, the county surveyor, based largely upon representations made to him by Tolley and another witness. Even this map locates the white parallel marks made by the spindle bolt and nut at about the same place where it is placed on the other map. However it purports to show tracks indicating that Whitfield's car struck the pavement some distance north and just over on the west side from the center, curving toward the east margin, went off the east margin for a short distance and then back in another curve until it finally went off toward the field. These tracks are explained by the plaintiff as those made by the car of Flowers and Hays when it turned around by backing and starting north again just after the accident in order that they might take Mr. Loveless home. The jury evidently believed this explanation. The map was made by Mr. McKissick just after he first visited the place on the 6th of June, 1923. This was nearly four months after the accident. The map was made upon information furnished by W. M. Tolley, Dock Crow and Mr. Whitfield. Mr. Tolley testified that he reached the scene of the accident between five and six o'clock on the evening of the day it occurred. He says that he made a careful examination of the tracks and he sustains the McKissick map as approximately correct. So does Mr. Crow. It is evident that the jury took the view that these gentlemen had mistaken the marks made by the Hays and Flowers car for tracks made by the Whitfield car.

In view of all of the foregoing testimony, we are of the opinion that there is material evidence to support the verdict of the jury, holding the defendant Whitfield liable, and the first assignment of error is overruled.

The second assignment of error is that the court erred in overruling the defendant's ground for a new trial because the verdict of the jury is so excessive as to show that the jury was influenced

by passion, prejudice or caprice, to the manifest injustice of the defendant. As has been stated, the circuit judge reduced by suggestion of remittitur the amount of the judgment from $8500 to $7635. The testimony clearly shows that the automobile was damaged to the extent of $1500. It is unnecessary to show this in detail because there is virtually no evidence to the contrary. The testimony is that the car was worth $1800, just before the accident and after the accident it was worth about $300. Plaintiff's expense amounted to $135. It is evident that the trial judge took the view that the sum of $6000 for the personal injuries was not excessive, and to this he added the damages to the car and expense for services of physicians, nurses and for medicines, amounting to $135. In view of the nature and extent of the injuries and the suffering and perhaps permanent unfitness of the plaintiff, we are unable to say that the amount of this judgment is so excessive as to indicate passion, caprice or prejudice. The jury is the sole and exclusive tribunal to fix the amount of damages, unless the circuit judge, or appellate court is satisfied that prejudice, caprice, corruption or other improper influence have operated to influence it. Jenkins v. Hawkins, 98 Tenn., 545; Brown v. Odill, 104 Tenn., 266; Packet Co. v. Hobbs, 105 Tenn., 304; American Lead Pencil Co. v. Davis, 108 Tenn., 251.

The plaintiff was thrown out of his car so violently upon the highway that his collar bone was broken, his body bruised in many parts, his right shoulder and arms so injured that they have dropped down and he does not naturally stand or walk erect, and it requires effort with some inconvenience to hold up his shoulder. He was confined to his home about three weeks. He suffered much pain. The testimony of his physicians is that he not only suffered a great deal, being badly injured, but that he had six ribs broken as well as the collar bone and that his right shoulder had dropped down. It is shown by the testimony of Mr. Whitaker and Mr. Turner, two of his business associates and close friends, that since the accident the plaintiff is very nervous, cannot make his own calculations, gets others to write for him; he walks with his shoulder down, shows a loss of energy and activity, cannot attend much to his business, has been irritable, worries all the time, and seems not to know the value of mules. Plaintiff testifies that prior to the accident he had always been in good health, was a strong, vigorous man and that his condition at the time of the trial was such as was above described. The trial took place more than a year after the accident. At that time it was shown that of the six ribs of the plaintiff that were broken, two of them were torn loose from the breast bone and large knots were still in evidence, that his right shoulder was enlarged and his right arm larger by an inch

and a half than before the accident; that in walking or sitting and at all times his right shoulder remains in a fallen or deformed position and dropped down from its original and correct position. In order to be comfortable he has to hold his arm akimbo—that is, his hand across his breast. He cannot sleep comfortably on either side, but must always lie upon his back to much inconvenience. During his confinement from the injury he suffered constant pain, was intermittently conscious and unconscious or rational, and there was much danger from his having pneumonia. While there is no expert testimony that these injuries are permanent, it is evident that they tend to permanency. It is clear, therefore, that the plaintiff was very seriously and painfully injured, that his physical strength and vigor are impaired, and that his ability and disposition to attend vigorously to his business affairs are very much diminished. The second assignment of error is overruled.

The third assignment of error is that the trial court erred in excluding the testimony of Dr. R. S. Perry, set forth in the assignment, substantially to the effect that on the afternoon of the accident he left Nashville about three o'clock in his car and that about four miles south of the scene of the accident he met a Franklin car going northward at a terrific rate of speed, the driver showing a disposition to claim the road; that in order to avoid him he took to the right just as near the ditch as he could without getting into the gully; and that he did not remember having met any other Franklin car on the road that evening; and that the curtains were up on this Franklin car as it is admitted they were up on the car of plaintiff. Counsel insist that this testimony was admissible for what it was worth, and cites a number of cases holding testimony admissible, showing the speed of cars a mile or little more from the scene of the accident, but none of them relating to a car as much as four miles away. This witness did not undertake to identify the car as that of the plaintiff. He merely said that a Franklin car was going very fast and recklessly. There is some evidence that there were other Franklin cars belonging to people who lived in or near Columbia. We are of the opinion that this testimony was so utterly remote as to be of little or no pertinent value to the issues in this cause; that if it would have been admitted it would have been of no value to the jury; that on the other hand the jury might have improperly inferred that this was the automobile of the plaintiff when there was no evidence to show it. In order to conclude that it was the automobile of the plaintiff it must first be inferred that it was the plaintiff's car, which inference would not be based on any positive proof, and upon this inference must be based another inference that four miles away the plaintiff was still running his car so recklessly and fast. An inference cannot be

based upon an inference but must be based upon facts. Railroad v. Lindamood, 111 Tenn., 457. For these reasons this assignment is overruled.

Assignment of error number four is that the court erred in not granting a new trial because of certain alleged statements made by the Honorable J. B. Garner, attorney for the plaintiff in his closing address to the jury. It is alleged that Mr. Garner recited to the jury that Fate Turner gave to the plaintiff a bottle of whiskey which plaintiff had on the day of the accident, and there was no proof of any witnesses in the case to this effect and this was highly improper and prejudicial to the defendant and was excepted to at the time. We are unable to understand how such a remark, even if not based on actual testimony, would be prejudicial, for it is admitted that plaintiff had the whiskey, and it does not really matter how he got it. However the witness O. W. Davis does testify that plaintiff told him that Fate Turner gave to plaintiff the bottle of liquor in question.

It is insisted that Mr. Garner in his closing address to the jury was guilty of misconduct in telling the jury that the defendant did not go to see the plaintiff, or inquire about his condition after he was injured in the accident, when there was no proof in the record by any witness of this fact; that this is improper and prejudicial. While the record does not disclose whether or not Mr. Whitfield went to see Mr. Loveless, or inquire about his condition, it appears that the trial judge gave the jury instructions that the jury were the judges of facts, and a statement of counsel was not evidence. This instruction was given also with reference to the statement as to the bottle of whiskey.

It is also claimed that Mr. Garner in his closing address to the jury spoke several times of Mr. Whitfield's millions and stated to the jury that Mr. Whitfield could pay a judgment for $25,000, the amount sued for, and never feel it; that there was no proof in the record as to any one of these statements and the same were prejudicial. The affidavit of Mr. Garner was produced and read upon motion for new trial, but in it he denies that he ever referred to the defendant's millions, but agreed with the defendant's counsel in a statement made by him in his previous argument that the defendant was able to pay, but was not the only man in the county who had money. This statement was objected to by counsel for defendant and the court said to the jury that it did not make any difference as to the wealth of either party. It does not appear that this statement influenced the jury in arriving at the amount of their judgment, and it does appear that it was caused by a statement made by counsel for defendant with reference to the wealth of both parties.

For these reasons this assignment.is overruled.

The fifth assignment of error is that a new trial should have been granted because Henry Pointer, one of the witnesses for the plaintiff at the noon hour of the first day of the trial of this cause said to the juror Frank Hull that both plaintiff and defendant were rich men with plenty of money, but one of them was the poor man's friend and associated with the ordinary class of people; and that the other man only associated with the upper class—thereby being guilty of trying to tamper with a juror by prejudicing him against the defendant and in favor of the plaintiff.

The affidavit of this juror Frank Hull was read, and in it he states that while he was in a restaurant at lunch on that day Mr. Henry Pointer introduced himself to him, telling him that he married the daughter of Mack Campbell, a friend of the juror; that after a short discussion of what it took to make a man, Pointer said to him that he lived near Mr. Loveless, that Mr. Loveless was a mighty clever man, especially to poor people around him, and he, the juror then said to Pointer that he was there as a juror and Pointer told him that he was there as a witness, and the conversation stopped. Henry Pointer swore in his affidavit that he did not know that Hull was a juror when he approached him and had the conversation with him. And when he learned that Hull was a juror he said nothing further about the case; that he never did say anything about the merits of the case. It is true that one T. S. Turpin testified upon the motion for new trial that Hull told him that Pointer. said to him that both parties were rich men, but that plaintiff was a friend to the poor class and the defendant to the higher class of people; but in this he is not sustained by Hull or Pointer. The trial judge has passed upon this testimony and there is evidence to sustain his conclusion that this was an act of inadvertence on the part of Pointer and that he was devoid of any intention of pursuing any improper conduct. We cannot see how this conversation might have affected the judgment of this juror. He states rather emphatically in his affidavit that he told both Pointer and Turpin that he was a juror and made it clear that he did not care to hear any sort of evidence about the case from them. We do not think that the trial judge erred in refusing to grant a new trial upon this ground, and this assignment is overruled.

The sixth assignment of error is that the trial judge erred in refusing to grant a new trial, because of certain alleged misconduct of one of the jurors. It is insisted that after the jury retired and while they were considering of their verdict, a portion of the jury being in favor of giving one amount and the balance in favor of giving a lesser amount, one of the jurors suggested to the jury that no doubt the defendant Mr. Whitfield had automobile ac-

cident insurance enough to pay such a verdict as they might give against him, that all automobile men now carried accident insurance; that this matter was discussed by the jurors before the verdict was rendered; and that this was prejudicial to the rights and interests of the defendant, and is reversible error.

While it is reversible error for the jury to hear and consider any evidence aside from that adduced before them at the trial, and it would be error to admit any evidence offered by the plaintiff as to the defendant having indemnity insurance, we must first ascertain whether or not there was material evidence before the trial judge upon the hearing of the motion for new trial; that whatever statement was made, or conversation was had, was not such misconduct as to justify the granting of a new trial.

The affidavit of ten of the jurors is to the effect that upon the first ballot taken and before anything whatever was said about automobile insurance, the jury were unanimously of the opinion that the defendant was liable under the evidence which had been introduced; that nine of the jurors stood originally in favor of a verdict for $15,000 in favor of the plaintiff; and three were in favor of a verdict for $5,000 in favor of the plaintiff; that then they entered into a discussion with a view of getting together and arriving at a verdict satisfactory to all; that after this one of the jurors made the casual remark in effect, that most all business men carried indemnity, or accident insurance, that immediately some of the jurors said that could not be taken into consideration as there was no proof in the case to that effect, and that the jury could not properly consider that question under any circumstances; to which all the jury agreed, and no further question of insurance was ever mentioned by any member of the jury. They further state that the juror mentioning insurance did not state it as a fact that either of the parties to this case had insurance, nor that he thought either of them had insurance, but merely casually stated that most all business men carried insurance; that there was no statement of a fact made as to this by any juror; that this statement with reference to insurance had no effect whatever upon the ten jurors making the affidavit and the same was not considered, and that the verdict was rendered on their part without any thought of insurance in their mind. They further stated that after some further discussion the nine jurors who were in favor of a verdict for $15,000 agreed to come down to $8500, and the other three jurors agreed to come up to $8500, as they all felt after a thorough discussion that such an amount would be a just and reasonable verdict, and they were solely influenced by the facts in the affidavit, and no outstanding matters of any kind affected them in any manner.

P. M. Wilkes one of the jurors in his separate affidavit says that while they were discussing the amount of damages which should be allowed to the plaintiff, one of the jury suggested that no doubt Mr. Whitfield had automobile accident insurance to pay such verdict as they might give against him, that all automobile men now generally carry accident insurance; that this matter was discussed by the jurors before the verdict was rendered. The other juror Felix Weatherford partly corroborated the juror Wilkes.

The trial judge evidently credited the statements made in the affidavit of the ten jurors. His finding must have been that the conversation occurred as set forth in the affidavit of the ten jurors.

It certainly was misconduct on the part of this juror to make any reference whatever to indemnity insurance. In the case of John T. Lellyett v. H. B. Bond, September Term, 1921, it was held by the Court of Civil Appeals that it was not reversible error for the trial judge to refuse to grant a new trial in a case growing out of an automobile collision when one juror said in substance that all automobile owners ought to carry insurance and that they would be foolish not to do so, and then another juror spoke up and said, but of course that would not have anything to do with this suit; and the matter of whether a man had liability insurance or not would not enter into the questions they were considering and this was at least decidedly agreed to by all of the jurors who had heard the matter of insurance mentioned.

The statement now in question differs slightly from that made in the Lellyett case, but it is analogous to it. It was only a general remark that business men carry automobile insurance. Only by inference could it be applied to the defendant. It was not a statement that the defendant carried automobile insurance. The custom of carrying indemnity insurance is now so prevalent that it would be a very ignorant juror who would not know that most business men carry automobile insurance. Consequently, if a case were reversed because of such a general statement, it would be on the theory that the jurors did not know that most business men carry automobile insurance. If we reverse a judgment because of such a general statement about a matter which is presumably well known everywhere, it would be hard to see why the reason for such reversal would be substantial. In view of the positive statement of the jurors that this general remark did not affect them, we do not think that this improper remark of a juror was prejudicial to the interest of the defendant. Although it is reprehensible conduct on the part of a juror to state, or intimate, to his fellow jurors that he possesses knowledge of facts, if he were permitted to relate them, they would turn their sympathies against the defendant, it is not sufficient cause for reversal, when the juror made no statement of fact and it does

not appear that any juror was affected by what he said in their presence. Irvine v. State, 104 Tenn., 132. This assignment of error is overruled.

The seventh assignment of error is that the court erred in refusing to grant a new trial when the defendant offered newly discovered evidence in the form of testimony of certain witnesses that the plaintiff was able to use his right arm freely when he had testified that he could not write letters or sign checks without great difficulty, and could not use or raise his right arm. The evidence offered is that of Dr. Pillow, Fred Latta, the Mayor of Columbia, and Captain Willoughby Jackson. They testified upon the motion for new trial that in January, 1924, they saw Mr. Loveless very freely playing the violin. They say that they never said anything about it to defendant, or his counsel, and defendant says in his affidavit that he never knew of it before the trial. This testimony might be very material, if the proof upon the trial were that the plaintiff could not use his arm, or write; but the plaintiff did not make such claim, but claimed that he could not straighten up his shoulder so as to make it erect. He did not make the statement that he could not use his right arm, or raise it, neither did he make the statement that he could not write letters. The injury to plaintiff's arm is in the shoulder and upper part of the arm and he might have played the violin and no doubt did so, with the lower part of the arm for a short while, as the witnesses sought to be introduced sought to testify and did testify before the court. The plaintiff himself says in his affidavit that he has, on various occasions and frequently played the fiddle with ease with his right arm. He says that on a few occasions he has played for a brief space of time, but not with ease with his right arm; but that each time he found that it was painful and he persisted for only a short time in playing. His testimony was that he was so injured that he could not use his right arm as he did before. He did tell the jury that he could not sign checks, or write letters without great difficulty. However this may be true and yet he could use the lower part of his arm for playing the fiddle for a short time. We do not think that this newly discovered evidence is of such material character that a new trial would be warranted in order that it might be introduced. Therefore this assignment of error is overruled.

The eighth assignment of error is that the court erred in refusing to grant a new trial on account of newly discovered evidence produced by the defendant in the affidavits of O. W. Davis, J. P. Wilson, Evans Moore and C. W. Knapton. The first three of these affiants purport to show that two or three days after the accident, they being employed as superintendent and helpers on the highway, visited the scene of this accident, found a lot of broken glass scattered over the

asphalt about or near where the place plaintiff's car stopped, and also found a black bow tie such as the plaintiff was accustomed to wear; that they also found broken glass, splinters and other evidences of the wreck scattered over the asphalt; that they swept all of this debris over beyond the asphalt. We do not think that this evidence is very material because these witnesses undertake to testify that this debris was near the edge of the asphalt. Whether it was on or off the asphalt at the time of the accident is not very material, for all the witnesses, including these, show that it was on the side of the highway. The proof is almost uncontradicted that the plaintiff's car was partly on the asphalt when it had stopped. The fact of the glass being at that point is testified to by the witnesses Flowers, Miss Ruth Parks, Campbell, Davis and Pointer. The affiant Wilson said that he did not see any glass, splinters or other debris south of the telephone pole near the place, nor the swipe or skid on the east side of the asphalt, and he says that it did not attract his attention; that he was simply looking for the glass that was on the highway to sweep it off and that he did not look any further south to see if there was any debris at the point where the plaintiff's witnesses testify that it was, nor did he look to see if there was any skid on the east side of the asphalt as they testify there was. Where witnesses have positively testified to facts as existent, the statement of witnesses to the effect that they did not notice or see them, especially when they were not looking for them, is of little, if any material value.

The affiant Knapton undertakes to say that on Monday following the accident, at the time when Clem Campbell said that Mr. Whitfield told him in Columbia that the accident occurred where the two marks began, he, the affiant was with defendant Whitfield at his home; and therefore this evidence would be material to contradict Clem Campbell's statement. Now the rule is, if the party or his counsel become aware of available testimony during the trial of the cause they will not be allowed a new trial in order to introduce a witness whom they could have introduced at the trial. In other words, applying this rule to this case, it appears that if Whitfield was at his home on that Monday morning he should have remembered that fact when he heard Clem Campbell testify that he was in Columbia on that morning. He could then have summoned Knapton and had him testify at the trial. For this reason this as a ground for a new trial does not comply with the rule requiring diligence in getting the witnesses. For these reasons the eighth assignment of error is overruled.

The ninth assignment of error is merely a general exception to the action of the court in overruling the motion for new trial and rendering judgment in the sum of $7635. This has been fully

treated in the discussion of all the foregoing. For reasons given in said discussions same is overruled.

It results that there is no error in the judgment of the circuit court and the same is affirmed. The defendant J. G. Whitfield and the surety on his appeal bond will pay the cost of this appeal.

Faw, P. J., and Crownover, J., concur.