HOWARD JOHNSON, Administrator, and P. H. FAUCETTE, Plaintiffs in Error, v. MAURY COUNTY TRUST COMPANY, Defendant in Error.

Middle Section.　July 16, 1932.

Petition for Certiorari denied by Supreme Court, January ·7, 1933.

Bell & Hibbitts, of Nashville, and Thomas H. Peebles of Columbia, for plaintiffs in error.

Horace Frierson, Jr., and M. E. Queener, both of Columbia, for defendant in error.

DeWITT, J. On May 15, 1930, Miss Laura Ferguson, a trained nurse, was killed by the overturning of an automobile owned by Mrs. Eleanora J. Faucette, while being driven by her husband, Dr. P. H. Faucette. The casualty occurred on the Jackson highway about five miles south of Columbia. Mrs. Faucette was fatally injured and died the next day. Dr. Faucette was a surgeon residing in Columbia. He was called to Lawrenceburg to perform a surgical operation. Being requested to bring with him a trained nurse he engaged the services of Miss Laura Ferguson. He owned an automobile which usually he employed in his practice. His wife, however, requested that on this trip he use her Chrysler Coupe, which was then well supplied with gasoline and his car was not so supplied; and the call was very urgent. Mrs. Faucette desired to go on the trip and to take with her her near neighbor, Mrs. Eskew, for their own pleasure and it was planned that these two ladies would amuse themselves while Dr. Faucette would be performing his professional duties. All this was fully agreed upon. The party left Columbia with Dr. Faucette driving, Mrs. Eskew sitting with him on the main seat and Mrs. Faucette and Miss Ferguson sitting on what is known as the rumble or rear seat ouside of the main body of the car. The wreck occurred about 8:30 P. M., where the highway runs at a long ascent in a straight direction. There is evidence that Dr. Faucette was driving the car at a rate of between 50 and 60 miles an hour just before he came in sight of a buggy and horse going in the same direction ahead of them. The main roadway was of concrete 18 feet wide but on east side was a shoulder from 4 to 6 feet wide, covered with gravel and other small loose stones. On the left side the shoulder was about 3 inches below the level of the concrete surface. On the right side, and about 5 feet from the shoulder was a ditch 1½ to 2 feet deep, toward which the ground sloped. A short distance before the Chrysler car reached the buggy Dr. Faucette saw the buggy and turned his car to the left to pass the buggy, and this was done safely, but just afterwards the front and rear left wheels of the car got off the concrete roadway and on to the shoulder. Thereupon the driver turned to the right, the car went across the road and into the ditch, turning completely over, throwing Miss Ferguson and Mrs. Faucette out. Miss Ferguson died at once and as aforesaid, Mrs. Faucette died on the next day. The car immediately took fire and

burned but Dr. Faucette and Mrs. Eskew were enabled to escape serious injury.

Just as the Chrysler car passed the buggy Dr. Faucette saw on the top of the hill about 150 yards in front of him, the lights of another car coming toward him at the rate of 15 to 20 miles an hour. From that instant he made the attempt to get on the right hand side of the road. Dr. Faucette testified that as he turned to the right his left front wheel grazed the edge of the concrete but the rear wheel did not, the car skidded "and shot right across to the bank and as it did it turned over."

This action was brought on August 18, 1930, by Maury County Trust Company, administrator of the estate of Miss Laura Ferguson against Howard Johnson, Administrator of the estate of Mrs. Eleanora J. Faucette, and also against Dr. P. H. Faucette; thus the action was not commenced within the lifetime of Mrs. Faucette. Upon the trial the jury awarded to the plaintiff administrator the sum of $10,000 as damages, against both defendants, but this was reduced by remittitur to $9,000, and for this sum judgment was rendered. The personal representative was sued upon the theory that Dr. Faucette, while acting as her agent in driving her car, at least in part on her business and for her pleasure, was guilty of negligence proximately resulting in the death of Miss Ferguson. In the declaration it was averred that Mrs. Faucette had died on May 6, 1930, and that on May 23, 1930, Howard Johnson was appointed administrator of her estate. A demurrer was interposed to the declaration by Howard Johnson, administrator, upon the ground, inter alia, that the suit was not commenced before the death of his intestate, and therefore no action would lie against her personal representative for the death of Miss Ferguson. This demurrer was overruled and to this action exceptions were taken. The defense was again insisted upon in motions for peremptory instruction, and finally in a motion in arrest of judgment. The learned Judge took the position that Mrs. Faucette was not the wrongdoer in the sense of the rule of the common law, "actio personalis moritur cum persona;" that the actual wrongdoer was Dr. Faucette; and that the action was maintainable against the personal representative of Mrs. Faucette, although not commenced within her lifetime. This conclusion is the subject of an earnest and able challenge upon this appeal in error.

It is conceded that if the rule of the common law is in force and is applicable, the action could not be commenced after the death of Mrs. Faucette. Assuming that Dr. Faucette was acting as the agent of his wife, in the furtherance of her business or pleasure, it matters not whether the relation was ex contractu or otherwise. The assumption that he was her agent is not based alone upon the marital relationship, but upon the other facts disclosed as to the agreements

and plans made for the trip, and the clear evidence as to the capacity in which each party was participating. If Mrs. Faucette would have been liable for the acts of her husband, it would not have been upon the mere principle that she was a guarantor to a person injured by his negligence, of compensation therefor; but upon the principle that she had put her husband in motion to do the act, and it must be regarded as done by herself. Her liability therefore would have been the same if she had done it in person. Cooley on Torts (4 Ed.), section 391. In this respect there is no difference between the maxims of the common law, respondeat superior and qui facit per alium facit per se. The latter maxim is the fundamental principle of the law of agency. Another form of the maxim, perhaps more applicable here. is qui facit per alium per seipsum facere videtur, in which the idea of the principal being considered as acting of himself is more forcibly stated. See Burrill Law Dictionary, Citing Story on Agency and Coke on Littleton.

If therefore, Mrs. Faucette would have been liable had the action been commenced in her lifetime, she would in a legalistic sense be deemed a wrongdoer, although the wrong was actually committed by her agent.

The common law rule that such a cause of action died with the death of the defendant has been abrogated to the extent that if the action was commenced during the lifetime of the defendant, it shall not abate by his death but may be revived, provided that it is not an action for wrongs affecting the character of the plaintiff. Shannon's Code, sections 4568, 4569, 4575, 4579. In Cherry v. Hardin, 4 Heisk., 200, this interpretation of the effect of our statutes upon the common law rule was clearly declared. The action was in trover for the conversion of two mules, but was brought after the death of the two allegedly guilty parties, against their personal representatives. The Supreme Court speaking through Justice Peter Turney, in referring to the Act said that it "was not intended to authorize the institution of actions ex delicto against the representatives of deceased persons, but was simply meant to warrant a revivor against a personal representative, the suit having been commenced against the wrongdoer in his lifetime; the terms of the act are too plain to allow of doubt as to their meaning."

It is the universal rule that where a statute simply preserves pending actions from abatement by the death of either party, it does not apply in a case where the action was not pending at the time of the death. 1 C. J., 165, citing cases.

In Harris v. Trust Company, 128 Tenn., 573, 162 S. W.. 584, a right of action for a libel contained in a will, although brought against the executor, was sustained on the theory that the right of

action never had any existence during the lifetime of the testator but arose after his death.

In Bowman v. Hart, 161 Tenn., 402, 33 S. W. (2d), 58, it was stated by the learned Chief Justice (who prepared the opinion in each of these cases) that, as noticed in the opinion in the Harris case, "the facts of that case took it out of the rule, that certain actions were buried with the person and the Court concluded that no extension of the rule was permissible." It is true that in the opinion in Harris v. Trust Company, there is embodied a very emphatic disapproval of the maxim, actio personalis moritur cum persona; and the Court said, "It is sufficient to say that no reason has ever been assigned for the existence of this rule which would satisfy an enlightened court of modern times." We are entirely in accord with this view of the rule, but it is a well settled rule of the common law which is in force in this State and has never been modified by statute in its application to such a case as that now before us; for a court to attempt to abrogate or modify it would be an act of judicial legislation. The unsoundness or injustice of the rule can only be remedied by act of the Legislature.

In Driver v. Arn, 6 Higgins, 583, it was said, perhaps as dictum, "It is true that if the wrongdoer dies before suit is brought, the right abates."

In Jared, Administrator, v. Ballard, Executrix, decided by the Court of Civil Appeals on February 1, 1923, two of the judges dissenting, the decision of the majority was approved by the Supreme Court as the writ of certiorari was denied on April 2, 1923. The decision was that an action by the administratrix of a woman who had been murdered by her husband cannot be brought against the personal representative of the husband, he having died before suit was commenced. This decision was rendered long after the decision in Harris v. Trust Company, supra.

The case of Railroad Company v. Vanhoy, 143 Tenn., 312, 226 S. W., 225, is, however, referred to, per contra, as it was brought against the administrator of an alleged wrongdoer for the death of plaintiff's wife in an automobile accident, both persons having been killed in the accident. But the right to bring the suit against the administrator of the wrongdoer was not challenged in the action, and such defense must have been treated as waived. Furthermore, the decision in Jared v. Ballard, supra, was a later decision.

It follows from these rules and authorities that this action as against the personal representative of Mrs. Faucette would not lie and should have been dismissed. The judgment against Howard Johnson, administrator, will be reversed and the suit dismissed as to him.

The insistence that the motion for a directed verdict in favor of Dr. Faucette should have been granted cannot be sustained, for there was substantial evidence from which the jury could infer that he was driving the car at an unreasonable and reckless rate of speed under the circumstances, and that he did not keep it under reasonable control. The driver of an automobile is bound to exercise an ordinary degree, or that degree, of care and caution which an ordinarily careful and prudent person would exercise under the same circumstances, and what would be considered ordinary care may vary according to the place and circumstances at the time. He cannot successfully invoke the emergency rule where his own negligence led him into the emergency. Cullum v. Glasgow, 3 Tenn. App., 443. The night was dark and it was the duty of the driver to anticipate the presence of vehicles on the highway, whether they had lights or not. The jury could infer from the evidence that the car was being driven at a reckless and unreasonable rate of speed under the circumstances; that this caused the driver to lose such control of the car as would enable him to avoid going on the shoulder or failing to keep the car on the highway after he undertook to turn to the right. It was a casualty which could have been avoided by ordinarily careful driving. The jury could find from the evidence that it was this unreasonable rate of speed which made it impossible to stop the car or avoid hitting the buggy when the buggy became visible; that it produced the necessity for attempting to pass the buggy and then to try to go up the hill when a car might be approaching just over the hill. Mrs. Eskew testified that she saw the oncoming automobile just as they were passing the buggy and just as the automobile "topped the hill" as it was coming toward them; that when their car passed the buggy it was going at the rate of about 55 miles an hour. Therefore, there was evidence supporting the conclusion that the negligence of the driver was the proximate cause of the death of Miss Ferguson. The issues were submitted to the jury alone upon the charges of common law negligence under the instructions of the Trial Judge.

The second and third counts of the declaration were based upon violations of certain sections of Chapter 87 of the Public Acts of 1929. During the trial the decision of the Supreme Court in Godsey v. The State, 162 Tenn., 568, 39 S. W. (2d), 286, was announced—declaring said Act to be unconstitutional. The Trial Judge very properly refused to submit to the jury any issues arising under these statutory counts. In his instructions he told the jury that it would not be necessary for him to instruct them regarding the law applicable to each count separately, but would instruct them as to the law applicable to all the counts and to the case as a whole. He then set forth the theories of both plaintiff and defendant. As to duties of

the driver of the car and of the plaintiff's intestate he set forth only the rules of the common law. These were involved in the first and fourth counts, and it was not error not to instruct the jury on each count separately.

The defendants insisted that the plaintiff was not entitled to recover because Miss Ferguson was guilty of negligence in not protesting against the rate of speed and the manner in which the car was being driven. This was a question for the jury to determine, as there was evidence that she was riding on the rumble seat where she could not see ahead of the car, nor see the speedometer, and could not realize the danger to her involved in the situation. Dedman v. Dedman, 155 Tenn., 241, 291 S. W., 449. The jury could infer that Miss Ferguson was relying upon the assumption that the driver was exercising care and caution. Railway & Light Co. v. Vangilder, 132 Tenn., 487, 178 S. W., 1117. She had frequently ridden in automobiles driven by Dr. Faucette while attending to professional duties. There is no evidence that on these occasions anything occurred to cause her to consider him as a reckless or careless driver. The Trial Judge instructed the jury fully and correctly that it was the duty of Miss Ferguson while riding in the car to exercise ordinary care and prudence for her own safety, and it was for them to determine whether or not she did on that occasion exercise ordinary care and prudence for her own safety, taking into consideration all the surrounding facts and circumstances. He further said that she was not absolutely bound to do any particular thing in connection with the operation of the car; however if there was anything which she should have done in the exercise of ordinary care and prudence in the way of warning the driver or protesting as to his conduct or leaving the car, or otherwise, and they should find that she failed to do what she should and could have done in the exercise of ordinary care and prudence for her own safety, and that her failure in this respect was the proximate cause of the accident and her death, or proximately contributed to it, then her personal representative would not be entitled to recover in this cause. He further said that in considering this feature of the case they must look to and consider where she was riding, what opportunity she had to see the speedometer or know the speed of the car, what opportunities she had to warn the driver or see ahead, and whether or not in the exercise of ordinary care and prudence she was required to do anything more than she did do. He further said that while a person riding in a car as a guest or otherwise, may rely to some extent upon the judgment and skill of the driver, such person must exercise ordinary care and prudence for her own safety, taking into consideration all the surrounding facts and circumstances. Certain instructions requested in behalf of defendants upon this issue were properly refused be-

cause the rules therein stated were fully embodied in these instructions actually given.

In behalf of Dr. Faucette the Trial Judge was requested to instruct the jury as follows:

"In order to succeed in its insistence that the speed of the automobile as driven by defendant Faucette was the cause of the death of plaintiff's intestate, Miss Laura Ferguson, the burden of the proof is upon the plaintiff to establish a state of facts which would naturally lead to the conclusion that Miss Laura Ferguson being thrown out of the car and on to the road and killed, were the natural and probable consequences of said speed of the automobile operated by P. H. Faucette."

This request was properly refused. After stating the theory of the plaintiff the Court said to the jury:

"Now if you find from the greater weight of all the evidence that in the driving of said car at the rate of speed at which it was being driven, and otherwise guiding and managing it, Dr. Faucette failed to exercise ordinary care and prudence, and that that failure on his part was the proximate cause of the accident and the death of Miss Ferguson, then the plaintiff would be entitled to recover, providing you find that at the time of the accident Miss Ferguson was exercising ordinary care and prudence for her own safety, and that her negligence was not the proximate cause and did not proximately contribute to bring about the accident or her death."

The instructions thus given were sound and clear, and the instructions so requested would not have given further aid to the jury in understanding how to interpret the evidence as to liability. The determinative facts of the case were almost undisputed, and under the instructions given it was the duty of the jury to make their own interpretation.

There was abundant evidence justifying the Trial Judge in giving the following instructions:

"It is insisted that on turning the car to the right, on account of the speed at which it was going and the want of care in turning it, that it went across the road to the right hand side thereof and struck the bank and overturned and killed the said Miss Ferguson."

This was a part of the negligent conduct of the driver as averred in the declaration, and there was abundant evidence tending to sustain this charge.

It is complained that the Court erred in instructing the jury as follows:

"The mere fact that Dr. Faucette was going on a professional call would not justify him in disregarding his duty to Miss Ferguson as hereinbefore explained."

The necessity for this statement does not clearly appear from the record but it was correct in principle. It appears without dispute that Dr. Faucette employed Miss Ferguson in behalf of her patient to go with him on this trip for the performance or professional duties. Of course he was obligated to exercise reasonable care and caution for her safety while taking her in the car for this purpose.

The Trial Judge was requested to instruct the jury that there could be no recovery for speed alone, but the speed of the car might be considered by them along with the other facts and circumstances of the case. In the instructions given the speed of the car was declared to be a basis of liability only in the event that it should be found to be dangerous and reckless, or of such extent that it was beyond ordinary care and prudence. The attention of the jury was drawn to this feature, and they could not reasonably infer from any of the instructions that mere speed was ground for liability when considered wholly apart from all the circumstances under which it was exercised. The theory propounded to the jury was that there must be a causal relation between the speed and the casualty; and that even then such speed must be so great that the driver was not exercising that ordinary care and prudence which was required under the circumstances. It is impossible to conclude that the jury could have misunderstood these instructions but received the impression that mere speed dissociated from other facts was being relied on or could be the predicate of liability. In the original declaration it was averred that the plaintiff's intestate left surviving her an aged mother, Mrs. Susie Smithson, also brothers and sisters. It is contended that from the failure to aver that she left surviving her a father, it must not be presumed that her father was dead, for it is a presumption that a person known to be once alive is still alive in the absence of evidence of his death. Upon this proposition is based the insistence that the surviving mother would be entitled only to one-half the recovery; that the judgment in any event should be reduced by one-half thereof. This is because of the provision of Chapter 50 of the Public Acts of 1923 (Code section 8389, subsection 4), that the father and mother inherit equally the personal estate of an intestate child who left no husband, wife or children. But the words, "she left surviving her an aged mother, Mrs. Susie Smithson, who was dependent upon the said Laura Ferguson for support," in the declaration, implied clearly that she left no father surviving her. The rule expressio unius est exclusio alterius, furnished the proper principle of interpretation.

At the commencement of the trial the plaintiff, by permission of the Court, amended the declaration by adding after the word "sisters" the following, . . . "to-wit:—Mrs. Bettie Potts, a sister, Mrs. Lucy Pearson, a sister, Roosevelt Smithson, a brother, and James Sanford, a brother, for the use of all of whom this action is brought."

This amendment amounted to surplusage. The brothers and sisters of the deceased would take no interest in the recovery. Even if they would, the amendment, although made more than one year after the death, referred to the commencement of the suit so as to prevent the running of the statute of limitation from and after the issuance of the summons. Love v. Southern Railway, 108 Tenn., 104, 65 S. W., 475; Railroad v. Brown, 125 Tenn., 351, 143 S. W., 1129. It cannot reasonably be concluded that the allowance of this amendment was other than a harmless irregularity; that the jury were influenced by the existence of brothers and sisters of the deceased to award a greater recovery than that which they would have awarded. Therefore it did not constitute reversible error. Shannon's Code, sections 6351 and 6351a1.

Mrs. Smithson, the surviving mother was allowed to testify that her deceased daughter helped to support her. She was also allowed to testify that Miss Ferguson left some brothers and sisters surviving her. While this evidence was immaterial the admission of it, in our opinion did not constitute reversible error. There was no testimony that the brothers and sisters were at all dependent upon Miss Ferguson or received any help from her. The admission of Mrs. Smithson's statement that her daughter helped her was challenged upon the authority of two Tennessee decisions—Davidson-Benedict Company v. Severson, 109 Tenn., 572, 72 S. W., 967; and Railroad v. Bentz, 108 Tenn., 670, 69 S. W., 317. In the Davidson-Benedict Company case it was merely held that there need be no testimony introduced to show that a beneficiary of an action was dependent for support or pecuniary aid upon the deceased in his lifetime, but it is sufficient, so far as this phase of the matter goes, to prove the status of widow, child, or next of kin as such.

In Railroad v. Bentz the Trial Judge was held to have erroneously charged the jury that they might look to the loss of advice and counsel, of comfort and enjoyment of society, that a widow has sustained in the death of her husband; that these were elements of damage to be considered by the jury in determining their award, should they find in favor of the plaintiff. This error was held to be reversible. The decision was made prior to the enactment of Chapter 32 of the Acts of 1911. It may be that this Act would not have controlled had it already been enacted, although it was contended that the amount of damages allowed by the jury fell short of the value of the

life of the deceased. It was held that in view of this affirmative error in the record the Court would not undertake to say how much, if anything, was allowed for the loss of the enjoyment of the society of the deceased husband. But in the instant case no instructions were given to the jury as to loss of help by the surviving mother as an element of damage. The jury were instructed that the administrator of Miss Ferguson, if entitled to recovery at all, would be entitled to recover compensation for the life lost, that is the value of the life of Miss Ferguson and no reference was made to any loss of help or support on the part of the surviving mother. In our opinion the admission of Mrs. Smithson's testimony that her deceased daughter rendered her some help in her lifetime, did not constitute reversible error.

After stating the elements to be considered in determining compensation for the value of the life lost, the Trial Judge said to the jury, ''and in addition you will allow such sum as you find was reasonable for funeral expenses, as shown in the proof.'' In disposing of the motion for a new trial his Honor held that the verdict of $10,000 was not excessive, but he suggested a remittitur of $1000 as representing the amount of funeral expenses; and this was accepted. The evidence showed that these expenses did not exceed this amount. Therefore, if there was any error in the instruction given as to funeral expenses it was cured by the remittitur. Miss Ferguson was thirty-seven years of age. She was a trained nurse, earning $6 a day and her board, and there is evidence that she was engaged at such service during very much of her time. The expectancy of her life was about thirty years. There is some evidence that she had been afflicted with diabetes, but there is also evidence that she was in good health on the day of the casualty. This Court is unwilling to hold that the sum of $9000 is an excessive valuation of her life.

During the trial a motion was made by defendants for a mistrial on the ground that one of the jurors had formed and expressed an opinion prior to being taken on the jury, which opinion was prejudicial and might influence him to render a verdict against defendants—that the defendants carried liability insurance against the accident involved. The Court overruled the motion and this action is assigned as error. The motion was supported by the affidavits of two gentlemen, in which they stated that on the previous morning before this cause was called for trial the juror stated in their presence that he did not believe that a policy of liability insurance held by Mrs. Faucette on her car exempted the insurer from liability when any one other than Mrs. Faucette was driving the car; that he, the juror, had in times past sold automobile liability insurance for the Farm Bureau and that he had never heard of such provision being in

such policy. The two affiants stated that this statement arose in a conversation among the three of them, when one of the affiants stated that he had been informed by one of the counsel for defendants that the Insurance Company would deny liability for any of the acts of Dr. Faucette in this accident because of the existence of such a clause in the policy. Upon the hearing of the motion for new trial the affidavit of this juror was read. In it he said:

"I do not remember the details of the conversation and what was said made little or no impression on me. I was not told that Dr. Faucette had insurance. I went in the jury box without having formed or expressed an opinion as to the matters involved in the case, and knew nothing about any insurance being carried by the parties. I did not act as a juror on what had been said by Mr. Sewell or Mr. Greenlaw, nor did I communicate it to my fellow jurors. I did state that I had written liability insurance, and that the question would always come up as to who would drive the car besides the owner."

He further stated that nothing was said as he recalled, about the counsel for the defendants or what each was relying on. This juror was then examined in open court. He testified that Messrs. Sewell and Greenlaw had a conversation with him about liability insurance but that he did not remember whether or not either of them stated whether or not there was any insurance on Mrs. Faucette's car, or whether Dr. Faucette carried any insurance. He said that the conversation impressed him very lightly.

Even if this juror did know that Mrs. Faucette carried liability insurance, this would not have justified a mistrial. Neither the plaintiff nor his counsel had anything whatever to do with imparting this knowledge to this or any other juror in the case. The defendants made no inquiries of this juror concerning liability insurance when he was examined upon his voir dire. The custom of automobile owners in carrying liability insurance is so common that it would be a very ignorant juror who would not know of it. Whitfield v. Loveless, 1 Tenn. App., 377. In Harbin v. Elam, 1 Tenn. App., 496, where the jury generally discussed the probability of the defendant having insurance, but no juror knew or undertook to state whether the defendant did or did not carry liability insurance, it was held not to be a ground for a new trial. This Court has in several cases of this character refused to reverse a judgment because witnesses voluntarily, in responding to any questions made reference to insurance or insurance agents. It is still reversible error for a plaintiff to seek to show, even by inference, that the defendant carried liability insurance, but the rule does not extend to a case where such reference is made without any solicitation, or

a juror knows otherwise of the general custom, or even of the existence of liability insurance to the defendant. Here no misconduct of party or counsel appears; nor any effect of the conversation which the juror in question had upon his course and conduct as a juror. It results that the assignment relating to this matter is overruled.

During the trial the Trial Judge, of his own motion, asked many questions of witnesses and these were answered. It is insisted that he exceeded the limits of his privilege to question witnesses; that he asked some improper questions; and that this practice ·tended to prevent an impartial trial.

The trial judge may ask questions if he takes care not to elicit incompetent evidence, and not to indicate his opinions and injure or prejudice the rights of either party. This is permissible for the purpose of informing himself or the jury as to any matters material to the issues; to clear up doubtful matters, or to refresh his memory as to testimony already given. 40 Cyc., 2439; Graham v. McReynolds, 90 Tenn., 690, 18 S. W., 272; Hill v. State, 5 Lea, 731; State v. Hargroves, 104 Tenn., 112, 56 S. W., 857.

In Hill v. State, supra, it was said that a judge "is not a mere figurehead," and, as was said in Butler v. Broyles, 10 Humph., 155, "may very properly ask questions of witnesses." It was also said: "and certainly it has never been held to be error for a trial judge, by a pertinent question, to elicit a fact overlooked by counsel which would tend to protect the innocent or prevent the escape of the guilty."

In McDonald v. State, 89 Tenn., 161, 14 S. W., 487, in which the plaintiff in error was under conviction of involuntary manslaughter, he had testified in his own behalf that deceased drew his hand from his pocket, and that he (the accused) thought he had a weapon. The trial judge asked: "Did you find any weapon in his hand or about him?" It does not appear from the report of the case that the question whether the deceased actually had a weapon had been raised or suggested until the judge put the question. The Supreme Court disapproved the action of the trial judge in asking the question, but declined to hold that it was error. The ground of the disapproval was that the question suggested to the jury that it was necessary to show the possession by the deceased of a weapon in order to make out self-defense; whereas, self-defense, under the law, was made out by showing that the accused honestly believed, upon reasonable grounds, that he was in danger of death or great bodily harm. In commenting upon the practice the Court said:

"We will only say that while the court may, as a matter of right and duty, call on a witness to repeat or explain what

he may have said on any subject of inquiry, he should do so with care and caution, and in a way not to indicate to the jury any impression of the weight or importance his mind attached to the testimony inquired about. It is natural that jurors should be anxious to know the mind of the court and follow it; therefore a court cannot be too cautious in his inquiries. As a rule courts are to try cases as made out by parties or attorneys, and not make the effort to supply what may seem to them as missing links in the chain of testimony; to do so would be error.''

In Parker v. State, 132 Tenn., 327, 178 S. W., 438, another criminal case, the trial judge, instead of permitting the counsel for the State to conduct the cross-examination of the defendant, in the main took charge of the matter himself. It was held that this could not have failed to impress the jury that he was hostile to the prisoner. In addition to this, the language used in framing the questions was sometimes exceedingly sharp and at all times it closely resembled similar performances on the part of opposing counsel. This examination by the judge comprised fully one-third of the prisoner's testimony. The view of the Supreme Court was thus expressed:

''While it is true that the judge may ask questions now and then for the purpose of clearing up points that seem obscure, and supplying omissions which the interests of justice demand, it is not proper that he conduct an extended examination of any witness, and particularly a prisoner on trial for his liberty or his life. Such a practice, if tolerated by this court, would be far more hurtful to the administration of justice than the escape of many prisoners. It is essential that trials shall be managed fairly, and that trial judges shall not only be just to both sides, but that they shall observe in their demeanor an even tenor, so that an impartial state of mind may be apparent to all concerned.''

These cases are earnestly relied on as authority for reversal of the judgment in the case before us.

The questions complained of were propounded to the defendant, Dr. Faucette. He had testified that he had presented the Chrysler car to his wife; that on the trip he was driving it with her full assent; that she could and did drive the car. The Trial Judge asked him, ''What business did your wife have with a car?'' A. ''She used it for business and pleasure.''

Q. ''Did she have any business outside of her pleasure?'' A. Well, she was not regularly employed, no.''

Q. ''The car was used largely for pleasure?'' A. ''Both cars were practically interchangeable all the time and we owned the

cars together. If I had a flat I would use her car and she would use mine in the same way."

Q. "Would you sometimes combine her pleasure with your business?" A. "Quite a number of times. That just looks like it would be the natural consequence of any man and wife."

Q. "So far as you know her business on this trip was pleasure?" Upon objection made, this question was not answered.

In view of our conclusion that the suit could not be brought against the personal representative of Mrs. Faucette, we consider this testimony as immaterial; for the true issue was as to the liability of Dr. Faucette for his acts, not the liability of her administrator. Furthermore, we do not think that the Trial Judge improperly asked these questions. It abundantly appeared from other testimony that the trip was intended by Mrs. Faucette as one for pleasure of herself and Mrs. Eskew.

On cross-examination by counsel Dr. Faucette was asked and answered:

"Q. Doctor, do you know anything about the tendency of a car while its wheels are off on a gravel shoulder and it is about to mount a concrete surface? A. I would from the appreciable length of time I had with this intervening car—I would have stayed on the shoulder."

The answer was not clear as responsive to the question of counsel. The Trial Judge thereupon examined the witness as follows:

"Court: What would the tendency be? A. As if there would not be any obstruction at all; it looked like you could run off just as easy as you could stay on the pavement.

"Court: What is the tendency? A. This was not really what you would call loose gravel—I don't know—the only way you can figure that would be the theoretical law. It is possible that a piece of gravel might have interposed itself between the rim and the hard surface even if it wasn't more than a half an inch.

"Court: You don't know what the general tendency is? A. With no more difference than that I don't think anybody could tell you, Judge Turner.

"Q. Never had any experience? A. I have run off of the shoulder lots of times—never had any accident.

"Q. Did you know the character of this road before this accident and prior to it? A. Well I don't say that I paid any particular attention to it—been over it quite a lot of times.

"Q. Is it as easy to manage a car on gravel surface as on concrete? A. Really if I had my preference, I had rather have chert.

"Q. I was speaking about gravel? A. Chert is gravel. A good gravel road is just as good as you can travel on—packed gravel—not loose gravel."

These questions are not of such character as to imply any bias or prejudice on the part of the Trial Judge. Manifestly they arose out of the fact that counsel had asked about the tendency of the car when its wheels were on the gravel, and out of the rather unsatisfactorily answer which had been given to the question. These questions had no effect further than to tend to clarify the evidence. And further, it does not appear that they brought forth any answers that were damaging to the defendant, the witness.

Dr. Faucette was asked by his counsel if, at the time when he passed the buggy, or before, he was conscious of the fact that there was an automobile coming down the hill from the opposite direction. He answered: "On seeing the buggy there was no car that could be seen, but just as I pulled around the buggy—then as I passed the buggy this car showed its lights on the top of the hill." He was then asked by counsel what he did when he saw the car. He answered: "Well, I immediately made an attempt to get on my side of the road—taking it for granted he was on the right side coming towards Columbia—and I would get on my side going the opposite direction." He was then asked and answered several questions further as to his vision being clear until he saw the light of the on-coming car. He was then examined and cross-examined at great length by counsel. It was only near the close of his examination that he was asked questions by the Trial Judge. His Honor, upon the subject of his seeing the lights, examined him as follows:

"Court: Doctor, did you see the reflection of the lights of this on-coming care before the lights themselves got in view? A. No, I said simultaneously it seemed like to me, the lights shone on the top of the hill.

"Court: I was distinguishing that from the reflection? A. Well you could hardly see those lights unless you were looking up.

"Mr. Peebles: Q. Did you actually see the reflection before you saw the light? A. No.

"Court: Reflection is usually visible before the light? A. I was looking at the shoulder of the road.

"Q. Before you saw the buggy, you had not seen the reflection of these lights? A. No, not when I saw the buggy—I usually drive a good distance ahead of me—

Again we are are of the opinion that the Trial Judge went no further than to bring out the facts a little more clearly, and showed no bias or prejudice. Furthermore, the answers to the questions could not have prejudiced the defendant, the witness. He said

plainly that he did not actually see the reflection of the light of the on-coming car before he saw the light. The question, ''Reflection is usually visible before the light?'' went perhaps too far, but we cannot say that it could have materially affected the verdict of the jury. The witness stated that it seemed to him that the lights of the car shone on the top of the hill simultaneously with the car coming into view.

In passing upon the motion for a new trial his Honor stated that the subject-matter about which inquiry was made by him had already been brought out by the testimony of the witness, that the questions were asked largely for the purpose of making clear what the witness had already said and to refresh the memory of the Court; and that it was not pointed out how the question and answers injuriously affected the defendant. He further said that it would be the right and duty of the judge to ask questions that might bring out evidence essential to a proper decision of the case on its merits; that a trial ought to be a proceeding to determine the rights of the parties and not merely a contest between opposing lawyers; that a Trial Judge, seeing that some important or material matter is about to be omitted should ask the witness concerning it and thereby avoid the possibility of a new trial and enable the jury and judge to consider the case more fully and intelligently.

In an action based upon negligent driving of an automobile, the proper application of rules of liability requires that the facts be presented in an orderly and precise form. An impartial and learned judge may seek to aid reasonably in bringing about such a presentation of the facts, provided it is done in a spirit and manner of utmost impartiality. As far as possible he should leave it to counsel to question the witnesses, but he has a right to do within the limits specified in the rules hereinbefore set forth. In our opinion there is nothing substantial in the insistence that it was error for the Trial Judge thus to question the witness. No injustice appears to have been done thereby.

With this we have disposed of all the propositions raised by the assignments of error. The judgment against Howard Johnson, administrator of the estate of Mrs. Faucette is reversed and the cause is dismissed as to said administrator. The judgment against Dr. Faucette in favor of Maury County Trust Company, administrator, is affirmed, and a judgment will be entered in this Court in accordance therewith for the sum of $9000, with interest from the date of the judgment in the Circuit Court, and all the costs of this cause. The costs of the appeal will also be adjudged against the surety on the appeal bond of Dr. Faucette.

Faw, P. J., and Crownover, J., concur.