**Paul E. CLECKNER and wife, Beverly Cleckner, Plaintiffs/Appellants,**

v.

**Lucien DALE, Defendant/Appellee.**

Court of Appeals of Tennessee,
Middle Section, at Nashville.

Aug. 13, 1986.

Rehearing Denied Aug. 29, 1986.

Application for Permission to Appeal
Denied by Supreme Court
Nov. 3, 1986.

Joe M. Haynes, Haynes & Associates, Goodlettsville, for plaintiffs/appellants.

William C. Moody, Moody & Moody, Nashville, for defendant/appellee.

## OPINION

KOCH, Judge.

This is a legal malpractice action against an attorney retained to represent the buyers in a real estate transaction. His clients filed this action in the Circuit Court for Davidson County after they were required to pay additional funds to obtain the release of a bank's attachments on the property. They alleged that their lawyer failed to inform them of the existence of these attachments and failed to conduct the closing in a proper manner. The jury determined that the lawyer had been negligent but that his negligence did not cause his clients' losses.

The clients have perfected this appeal. In addition to their assertion that the jury's verdict is contrary to the weight of the evidence, they contend that the trial court erroneously excluded expert proof concerning the standard of care of lawyers representing clients in real estate transactions. They also insist that the trial court's comments and instructions to the jury erroneously characterized the duty of a closing attorney. We have determined that this judgment should be reversed.

### I.

In early 1979 Lester Cramer offered to sell Paul Cleckner, his uncle, two parcels of real property located in Hendersonville. Cramer needed the funds to continue to operate his financially troubled health spa. Cleckner knew his nephew was having fi-

nancial problems and agreed to buy the property because he thought it was a good investment.

Neither Cleckner nor Cramer was represented by a real estate agent. However, Cleckner and his wife retained Lucien Dale, a Nashville attorney, to represent them in this transaction. Dale had represented both Cleckner and Cramer on separate occasions in the past. In fact, at the time the Cleckners retained Dale to represent them, Dale was also consulting with Cramer about filing a bankruptcy petition. Dale's services to the Cleckners were to include (1) the preparation of a contract of sale, (2) the preparation of the deeds, and (3) the oversight of the closing between the parties.

After they agreed upon the basic components of the transaction, Cleckner instructed Cramer to meet with Dale to outline their agreement and to obtain a contract for the sale of real estate. Cleckner followed this up with a telephone call to Dale to make sure that the contract contained the provisions he was insisting upon. As a result of these conversations, Dale drafted a contract for the sale of real estate dated March 29, 1979.

This contract was embodied in a standard title company form. In essence, it provided that the Cleckners would acquire the two parcels of Hendersonville property by paying the Cramers $9,500 and then by assuming the existing mortgages on the property. The contract required the Cleckners to pay the Cramers $3,500 as earnest money. It also required the Cramers to provide the Cleckners "as of the date of the deed" with "a title policy in the usual form."

█ Cramer brought the contract Dale had prepared back to Cleckner. Cleckner had a telephone conversation with Dale on April 4, 1979 after the contract had been executed concerning the payment of the earnest money.[1] Cleckner informed Dale

---

1. Dale recorded this telephone conversation without Cleckner's knowledge or consent. The practice of tape recording any private conversation without the consent or prior knowledge of all parties to the conversation is a violation of the Code of Professional Responsibility. See A.B.A.Comm. on Ethics and Professional Responsibility, Formal Op. 337 (1974) and

that he had not paid the earnest money to Cramer because the mortgagees had not yet agreed to the assumption of the existing mortgage loans. Dale informed him that both mortgage companies had approved these assumptions with no increase in their interest rate. In answer to Cleckner's question about whether he should pay the earnest money to Cramer, Dale replied "I think it would be safe on the contract." Cleckner paid Cramer the $3,500 earnest money on April 5, 1979 relying upon Dale's advice.

Dale received a telephone call on April 5, 1979 from an attorney representing a bank that had loaned money to Cramer informing him that the bank had attached the two parcels of property Cramer had agreed to sell to the Cleckners. The bank took this action on March 28, 1979, the day before Dale had prepared the contract between Cramer and Cleckner, because it had been informed that Cramer was planning to sell the property.

Dale attempted without success to reach Cleckner by telephone to alert him to the bank's action. On April 6, 1979, he wrote Cleckner a letter advising him not to pay Cramer the earnest money because "Commerce Union Bank has sued out an attachment against all his property in Sumner County." The letter concludes by stating "I will try to get back in touch with you in a day or two." Even though Dale had Cleckner's correct office address in his file, he mailed this letter to a home address where Cleckner had not lived for six months. The address also contained an incorrect zip code. It took ten days to deliver this letter.

Contrary to his statement in the April 6, 1979 letter, Dale made no other effort to contact Cleckner about this matter. The next conversation between the two men occurred on April 11, 1979 when Cleckner, Cramer and Dale met in Dale's office to close this transaction.

The closing was prolonged because the three men had a wide-ranging discussion about Cramer's financial condition. As a result of this conversation, Cleckner became aware for the first time that Cramer owed money to the Commerce Union Bank. He was also informed that this loan was secured by another piece of property and that Cramer had adequate collateral to satisfy the bank. He continued to be unaware that the bank had already attached the property he was buying because he had not yet received Dale's misaddressed letter.

Dale concedes that he did not tell Cleckner about the telephone call he. had received from the bank's lawyer or the bank's attachment of the property at the closing. He also concedes that he did not mention his April 6, 1979 letter. Later, he attempted to justify his failure to do so by stating that he had "assumed" Cleckner had received the letter and that he had also assumed "these kin folks wanted to go ahead" with the sale.

Dale presided over the closing of the transaction. Cleckner paid over to Cramer the additional purchase price that was due, and Cramer tendered two executed warranty deeds conveying the property to the Cleckners. These standard form deeds had been prepared by Dale prior to the time he had learned of the bank's attachments. He had neglected to change them to reflect the information he had received prior to the closing. Thus, each deed provided that the Cramers warranted that the property was "unencumbered, unless otherwise herein set out." The only encumbrances listed on the deeds were the first mortgages on each piece of property. There is no evidence that Dale informed Cleckner that this warranty was incorrect.

The closing was deficient in two other respects. First, the Cramers did not provide the Cleckners with the title insurance policy required by the contract of sale. Although the parties are vague about why no policy or commitment letter was ex-

Tenn.Bd. of Professional Responsibility, Formal Op. 81–F–14 (1981). An attorney's use against a client of a clandestine recording of a conversa-

tion with the client is also a violation of Tenn.S. Ct.R. 8, EC 4–5.

changed, Dale testified later that he had decided "that it would be to no avail to secure a title policy with 10 or 15 exceptions upon it which could not be omitted or removed." He thought that foregoing the insurance would save Cleckner and Cramer the cost of the title insurance premium if they decided to proceed with the sale. There is no evidence that Dale explained this decision to his client at the closing.

The second anomaly in the closing relates to the status of the title to the property following the transaction. Apparently the parties had a lengthy discussion about whether this transaction would be voidable if Cramer filed a bankruptcy petition. Dale advised Cleckner and Cramer that the sale would not be set aside because it was an arms-length transaction in which the property was sold at fair market value and because the proceeds of the sale were going to be used in Cramer's business. Cleckner testified that Dale informed him that

> he couldn't get me a title at this time. And he told me—we were talking about the bankruptcy and this was the key factor that Mr. Cramer probably would commit bankruptcy but felt like we were safe and would eventually get it [title to the property] whenever they looked at it six months to a year, whatever it was.

Cleckner finally received Dale's April 6, 1979 letter on April 16, 1979, five days after the closing. This was when he first became aware that the property had been attached. On April 19, 1979 he received a letter from the bank's attorney also informing him that the property had been attached. He consulted with Dale about these developments and, with the assistance of another lawyer, was eventually able to obtain a release of the attachments by paying the bank an additional ten thousand dollars.

## II.

### The Use of Expert Testimony in Legal Malpractice Cases

■ The Cleckners sought to introduce expert testimony concerning the proper standard of care for lawyers representing clients in a real estate closing and whether Dale's conduct in this case met that standard. The trial court prevented them from doing so apparently because of its view that a lawyer is not "in control" when providing a client legal advice and because it intended to provide detailed instructions to the jury concerning a lawyer's standard of care.[2] We have concluded that the trial court erred both as a matter of fact and as a matter of law. In addition to his responsibility to advise the Cleckners, Dale was also in complete control of the process used to finalize the real estate transaction at issue. Proof in the form of expert opinion is admissible on matters within an expert's superior knowledge that are not in the common knowledge of lay persons.

■ A lawyer's standard of care does not differ markedly from that of physicians or other professionals. *Stricklan v. Koella,* 546 S.W.2d 810, 812–13 (Tenn.App.1976) and *Delmar Vineyard v. Timmons,* 486 S.W.2d 914, 920 (Tenn.App.1972). See also *Dean v. Conn,* 419 So.2d 148, 150 (Miss. 1982) and W. Keeton, *Prosser & Keeton on the Law of Torts* § 32, at 185–86 (5th ed. 1984). While a lawyer does not guarantee all that he does, *In re Woods,* 158 Tenn. 383, 389, 13 S.W.2d 800, 803 (1929), the Tennessee Supreme Court noted as early as 1881 that

> When a person adopts the profession of the law, and assumes to exercise its duties in behalf of another for hire and reward, he must be held to employ in his undertaking a reasonable degree of care and skill; and if any injury result to the client from want of such reasonable care and skill, the attorney must respond to the extent of the injury sustained.

---

2. Dale asserts in his brief that the trial court excluded this testimony because the hypothetical question the Cleckners' lawyer posed to his witness was improper. This is incorrect. The trial court specifically found the hypothetical question to be "complete" before it held that the question could not be asked.

*A.T. Bruce & Co. v. Baxter,* 75 Tenn. (7 Lea) 477, 481 (1881).

A lawyer's conduct is now measured against the degree of care, skill, and diligence which is commonly possessed and exercised by attorneys practicing in the same jurisdiction. *Spalding v. Davis,* 674 S.W.2d 710, 714 (Tenn.1984).

Whether a lawyer's conduct meets a particular standard of conduct is not a question of law for the court. It is a question of fact for the jury or other finder of fact to decide. *Gruse v. Belline,* 138 Ill.App.3d 689, 93 Ill.Dec. 297, 301, 486 N.E.2d 398, 402 (1985) and *Glidden v. Terranova,* 12 Mass.App. 597, 427 N.E.2d 1169, 1170 (1981). See also Wade, *The Attorney's Liability for Negligence,* 12 Vand.L.Rev. 755, 776 (1959). Whether a lawyer's conduct meets the applicable professional standards is generally believed to be beyond the common knowledge of laypersons. Thus, except in cases involving clear and palpable negligence, most courts considering the issue have held that cases of legal malpractice cannot be decided without expert proof regarding the applicable standard of care and whether the lawyer's conduct complies with this standard. *Lentino v. Fringe Employee Plans, Inc.,* 611 F.2d 474, 480 (3d Cir.1979); *Hill v. Okay Construction Co.,* 312 Minn. 324, 252 N.W.2d 107, 116 (1977); *Gruse v. Belline,* 138 Ill.App.3d 689, 93 Ill.Dec. 297, 301, 486 N.E.2d 398, 402 (1985); *Fall River Savings Bank v. Callahan,* 18 Mass.App. 76, 463 N.E.2d 555, 560 (1984); *Bent v. Green,* 39 Conn.Sup. 416, 466 A.2d 322, 325 (1983); *O'Neil v. Bergan,* 452 A.2d 337, 341 (D.C. App.1982).[3]

These holdings are in full accord with the standards of proof the courts of this state apply to other professional malpractice cases. Expert opinions are admissible if they relate to matters within the expert's superior knowledge and if they will assist the trier of fact in its decision. *McCravy v. State,* 133 Tenn. 358, 368, 181 S.W. 165, 168 (1915) and *Luallen v. Booher,* 62 Tenn.App. 155, 159–60, 460 S.W.2d 24, 26 (1970). Our courts have extended this principle in medical malpractice cases by holding that except for the most obvious cases, medical negligence can be proved only through expert testimony because these matters do not lie within the common knowledge of laypersons. *Runnells v. Rogers,* 596 S.W.2d 87, 89 (Tenn.1980); *Bowman v. Henard,* 547 S.W.2d 527, 530–31 (Tenn.1977); and *Ayers v. Rutherford Hospital, Inc.,* 689 S.W.2d 155, 160 (Tenn. App.1984).

We have determined that the evidentiary principles developed in medical malpractice cases are equally applicable to legal malpractice cases. The lawyer's standard of care, except in the most extreme cases, should be proved using expert testimony.[4] Likewise, whether the lawyer's conduct in a given case departed from the applicable standard should also be proved by expert testimony. Therefore, we find that the trial court erred by refusing to permit the Cleckners to put on expert proof concerning Dale's conduct in this case.

That a lawyer is serving a client in an advisory capacity is no basis to create a different evidentiary standard. When a lawyer is advising a client on a legal matter, he or she is in a position no different from that of a physician advising a client of options for medical treatment. Under the doctrine of informed consent, a doctor can

---

**3.** See also 3 F. Harper, F. James & O. Gray, *The Law of Torts* § 17.1, at 551 (2d ed. 1986); 2 J. Dooley, *Modern Tort Law* § 33.04 (B. Lindahl Rev.1983) (1985 Cum.Supp.); W. Keeton, *Prosser & Keeton on the Law of Torts* § 32, at 188 (5th ed. 1984); Annot., 14 A.L.R.4th 170 §§ 3 & 4 (1982); and 7 J. Wigmore, *Evidence in Trials at Common Law* § 1984, at 230 (J. Chadbourn Rev.1978).

**4.** The standard of care applicable to a particular case will vary depending upon the type of legal activity involved. The standard of care applicable to civil litigators may not be the same standard applicable to lawyers representing the buyers in a real estate transaction or to lawyers drafting complicated testamentary instruments. The varied nature of the practice of law underscores the necessity of expert proof intended to acquaint the finder of fact with the applicable professional standard in each case.

be found negligent for failing to advise a patient regarding the consequences of medical treatment. In this context, the doctor's liability is based upon the nondisclosure of pertinent information. The doctor's liability is independent of the patient's conduct. This Court has held in informed consent cases that the appropriate standard of care and the conformity of the doctor's conduct to this standard must be proved using expert testimony. *German v. Nichopoulos*, 577 S.W.2d 197, 202 (Tenn.App. 1978). The same rules should apply to attorneys who are advising their clients.

A client should not be left to bear the full consequences of a decision made in reliance upon his lawyer's advice when his lawyer's advice was deficient. Thus, the fact finder's inquiry in this case cannot end with the conclusion that the Cleckners had the ultimate responsibility to decide whether or not to proceed with this transaction. While this is unquestionably true, this is where the inquiry begins.

The principal issues in this case are whether the advice Dale gave the Cleckners adequately informed them of their potential options and the consequences of these options and whether Dale's conduct met the minimum standards of professional conduct expected of lawyers representing the buyers in a real estate transaction. If the finder of fact determines that the lawyer's conduct complies with the applicable standard of professional conduct, then the lawyer cannot be held liable for the consequences of his client's informed decision. If, however, the finder of fact determines that the lawyer's conduct was deficient and did not meet the applicable professional standards, then the lawyer may be liable for the losses resulting from the client's reliance upon the deficient legal advice.

### III.

### *The Trial Court's Comments and Instructions to the Jury*

The Cleckners also assert that the trial court commented inappropriately upon the evidence and gave misleading instructions to the jury. Specifically, they complain that the trial court's questions to the witnesses and comments during the trial implied that Mr. Cleckner was the author of his own misfortune. They also insist that the trial court provided the jury with an erroneous expert opinion concerning a lawyer's standard of care in real estate closings twenty years ago.

### A.

The manner in which a trial judge conducts a trial has a commanding influence over a jury. *Ellis v. Spurgin*, 48 Tenn. (1 Heisk.) 74, 77–78 (1870). Thus, the Tennessee Supreme Court has held that it is error for a trial judge

> to show by his active interference in the conduct of the cause that he was not the impartial arbiter he should be.
>
> *Hill v. State*, 73 Tenn. (5 Lea) 725, 731 (1880).

With this in mind, this Court has approved the practice of a trial judge questioning witnesses but has cautioned

> [t]he trial judge may ask questions if he takes care not to elicit incompetent evidence, and not to indicate his opinions and injure or prejudice the rights of either party.
>
> *Johnson and Faucette v. Maury County Trust Co.*, 15 Tenn.App. 326, 339 (1932).

■ The trial court frequently injected itself into the trial of this case by questioning the witnesses and making explanatory comments to the jury. We have reviewed the entire record and have determined that the trial court's questioning of the plaintiffs' witnesses in the presence of the jury did not indicate its opinions and thus did not prejudice the rights of either party.

### B.

■ We now turn to the trial court's comments and jury instructions concerning the standard of professional conduct applicable in this case. The trial court, assuming the role of an expert, undertook to define the standard of professional conduct

the jury should apply in this case. This was improper.

Article VI, Section 9 of the Tennessee Constitution [5] has a two-fold purpose. It is intended to provide all litigants with an impartial trial judge and to preserve the jury's role as a finder of fact. *Leighton v. Henderson*, 220 Tenn. 91, 98, 414 S.W.2d 419, 421 (1967) and *Renney v. Mayfield*, 5 Tenn. (5 Hayw.) 165, 166–67 (1817). It accomplishes these purposes by preventing the trial judge from influencing the jury's deliberations by "summing up" the evidence in the manner of English courts, commenting upon the weight of the evidence, or instructing the jury concerning the factual conclusions to be drawn from the evidence. *Bolin v. State*, 219 Tenn. 4, 15, 405 S.W.2d 768, 773 (1966); *Tyrus v. Kansas City, Ft. Scott & Memphis Railroad Co.*, 114 Tenn. 579, 584, 86 S.W. 1074, 1075 (1905); and *Ivey v. Hodges*, 23 Tenn. (4 Hum.) 154, 155–56 (1843). Since the determination of the applicable standard of professional conduct in a legal malpractice case is a question of fact for the jury, the trial court's comments and instructions on these matters amount to a usurpation of the jury's responsibility. They amount to the trial court instructing the jury concerning the conclusions the jury should draw from the evidence. Thus, they run afoul of Article VI, Section 9 of the Tennessee Constitution.

■ There are other compelling reasons why allowing the trial court to act as an expert witness is inappropriate. First, the trial court's normal influence upon the jury is heightened in legal malpractice cases. The jury, knowing that the trial judge is a lawyer, will naturally presume that he or she is an expert in all legal matters. This, of course, is erroneous. Lawyers have never been presumed to know all the law. *National Savings Bank of the District of Columbia v. Ward*, 100 U.S. (10 Otto) 195, 199, 25 L.Ed. 621, 623 (1880). Over one hundred and sixty years ago, the Court of

King's Bench and Common Pleas likewise noted:

> No attorney is bound to know all the law, God forbid that it should be imagined that an attorney, or a counsel, or even a judge is bound to know all the law. *Montriou v. Jefferys*, 172 Eng.Rep. 51, 53 (N.P.1825)

A trial judge, solely by virtue of the office, does not possess sufficient familiarity with all legal endeavors to enable the judge to testify authoritatively concerning the proper standard of conduct for each case.

Another reason to discourage the trial judge from acting as an expert in a legal malpractice case is the parties' lack of opportunity to test the weight and reliability of the trial court's opinion. If the trial court's opinion is based upon its personal experience, its evidentiary foundation will not be before the jury and will not be subject to cross examination by counsel. This is improper. See *Bonhiver v. Rotenberg, Schwartzman & Richards*, 461 F.2d 925, 928–29 (7th Cir.1972) and *Sheetz v. Morgan*, 98 Ill.App.3d 794, 54 Ill.Dec. 117, 120–21, 424 N.E.2d 867, 870–71 (1981).

The final reason why it is improper for the trial court to instruct the jury concerning the applicable standard of professional conduct in a legal malpractice case stems from the confusion these instructions will create in the minds of the jury. Juries are not generally bound to accept an expert witness' conclusions. *Haskins v. Howard*, 159 Tenn. 86, 96–97, 16 S.W.2d 20, 23 (1929). However, it will be difficult for them not to do so when the expert conclusions are those of the trial court itself. If other expert opinions have been admitted into evidence, it would not be uncommon for the jurors to believe that the trial judge's opinions are more reliable merely because the trial judge is on the bench. This would interfere inappropriately with the jury's ability to determine the weight of the evidence independent from influence by the trial court.

5. This constitutional provision provides:
   The Judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law.

## IV.

The judgment of the trial court is reversed, and the case is remanded for a new trial in accordance with this opinion. The costs of this appeal are taxed to Lucien Dale for which execution, if necessary, may issue.

TODD, P.J., and LEWIS, J., concur.

## OPINION ON PETITION FOR REHEARING

KOCH, Judge.

The appellee has filed a petition for rehearing in accordance with Tenn.R. App.P. 39 asserting that the errors committed by the trial court were, at most, harmless. We disagree and, therefore, deny the petition with costs to the appellee.

TODD, P.J., and LEWIS, J., concur.